AO 440 (Rev. 10/93) Summons in a Civil Action - SDNY WEB 4/99

# United States District Court

SOUTHERN _____ DISTRICT OF _____ NEW YORK

JENNIFER TAYLOR, On Behalf of Herself and All
Others Similarly Situated,

AMENDED

## SUMMONS IN A CIVIL CASE

### V.

CASE NUMBER:

MONSTER WORLDWIDE INC., ANDREW J.
McKELVEY, GEORGE R. EISELE, et al

TO: (Name and address of defendant)

See Attached Schedule A

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

FEB 1 6 2007

CLERK

_____
(BY) DEPUTY CLERK

DATE

## SCHEDULE A

Patrick Harrington
c/o Monster Worldwide Inc.
622 Third Avenue
39th Floor
New York, NY 10017

Greg Limoges
c/o Monster Worldwide Inc.
622 Third Avenue
39th Floor
New York, NY 10017

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER TAYLOR, On Behalf of Herself and All Others Similarly Situated, | : Civil Action No.: 06-cv-8322 |
| Plaintiff, | : |
| v. | : |
| MONSTER WORLDWIDE INC., ANDREW J. McKELVEY, GEORGE R. EISELE, JOHN R. GAULDING, JOHN SWANN, MICHAEL KAUFMAN, RONALD J. KRAMER, DAVID A. STEIN, JAMES J. TREACY, JEFFREY C. TAYLOR, THOMAS G. COLLISON, PAUL CAMARA, JOHN MCLAUGHLIN, MYRON F. OLESNYCKYJ, MICHAEL E. SILECK, PETER DOLPHIN, BRIAN FARREY, STEVE POGORZELSKI, ROBERT J. O'CONNELL, BRADFORD J. BAKER, CHRIS G. POWER, DAVID A. HOSOKAWA, STUART J. McKELVEY, WILLIAM M. PASTORE, JONATHAN TRUMBULL, PATRICK HARRINGTON, GREG LIMOGES and MONSTER WORLDWIDE, INC. 401(K) SAVINGS PLAN ADMINISTRATIVE COMMITTEE, | : |
| Defendants. | : |

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff, a participant in the Monster Worldwide, Inc. ("Monster Worldwide" or the "Company") 401(k) Savings Plan (the "Plan"), on behalf of herself and a class of all others similarly situated (the "Participants"), alleges as follows:

## INTRODUCTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan fiduciaries, including

1

Monster Worldwide.

2.       Employee 401(k) plans confer tax benefits on participating employees to incentivize saving for retirement or other long-term goals. Employees participating in a 401(k) plan may have the option of purchasing the common stock of, or other investment options created by, their employer, often the sponsor of the plan, for part of their retirement investment portfolios. Company stock is an investment alternative in the Plan.

3.       Plaintiff was an employee of Monster Worldwide and a participant in the Plan whose retirement investment portfolio included Monster Worldwide stock.

4.       Plaintiff's claims arise from a pervasive options-backdated scheme at Monster Worldwide in which the fiduciaries of the Plan reaped millions of dollars for themselves at the expense of the Plan and Participants. While Defendants were granting themselves backdating options at discounted prices, they were misleading the Plan and its participants by falsely representing that the options to Defendants were awarded at the fair market value (or closing price) of the stock on the day of the options grant. At the same time, Defendants were also causing the Plan and its Participants to acquire Company stock at much higher market prices. Plaintiff alleges that Defendants, who are Plan fiduciaries, failed to act solely in the interest of the Participants and beneficiaries of the Plan and failed to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets as is required by ERISA.

5.       Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to Plaintiff and to the other Participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of Monster Worldwide stock.

6.      During the Class Period, as alleged herein, Defendants knew or should have known that Monster Worldwide stock was an imprudent investment alternative for the Plan due to the rampant business improprieties occurring at the Company, including a massive scheme to backdate options which enabled Defendants to reap hundreds of millions of dollars themselves on sales of Monster Worldwide stock at the same time that these Defendants were causing the Plan and its Participants to acquire the stock.

7.      Now that the scheme has been disclosed and the Company has had to restate its financial results, some of the Plan fiduciaries have resigned or been terminated, and the prosecutors are investigating and pursuing criminal charges against some of the fiduciaries. Although the government continues its investigation of Defendants' options backdating scheme, on February 15, 2007 the first of these Defendants pleaded guilty to conspiracy and securities fraud charges arising from the options backdating scheme.  That Defendant -- Myron Olesnyckyj, who was the Company's General Counsel and Senior Vice President -- pleaded guilty to participating in a fraudulent scheme to backdate the grant dates of stock options for the Company's employees, officers and directors to coincide with the dates of low closing prices for the Company's common stock, resulting in numerous grants of in-the-money options.

8.      Plaintiff now seeks to hold Defendants liable under ERISA and compel them to restore the diminution of vested benefits sustained by the Plan as a result of their breaching their fiduciary obligations.

## JURISDICTION AND VENUE

9.      **Subject Matter Jurisdiction**: This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original,

3

exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

10. **Personal Jurisdiction**: ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of New York. Defendant Monster has its headquarters within this District.

11. **Venue**: Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1 132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district. In addition, regulators in this district have requested records from many companies, and/or are investigating many companies, in connection with the inappropriate backdating of executive stock options, a practice allegedly engaged in by the Company as alleged herein.

## PARTIES

### Plaintiff

12. Plaintiff Jennifer Taylor was a Monster Worldwide employee, a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Monster Worldwide stock in her retirement investment portfolio during the Class Period.

**Defendant**

13.    Defendant Monster Worldwide is a Delaware corporation with its corporate headquarters at 622 Third Avenue, 39th Floor, New York, NY 10017. The Company was formerly known as TMP Worldwide, Inc. ("TMP") and changed its name to Monster, on May 1, 2003. Monster common stock trades on the NASDAQ under the symbol "MNST."

14.    Defendant Monster Worldwide is a fiduciary of the Plan because it is the Plan Administrator. The Plan documents (including the February 16, 2006 Summary Plan Description) and the Forms 5500 filed by the Plan with the Department of Labor ("DOL") identify Monster Worldwide as the Plan Administrator.

15.    Monster Worldwide had effective control over the Plan-related activities of its directors, officers and employees and at all times acted through its Board of Directors as well as its officer and employees including its Chief Executive Officer and members of any Monster Worldwide committees, appointed to perform Plan-related fiduciary functions in the course and scope of their employment. Through its Board of Directors or otherwise, Monster Worldwide had the authority and discretion to hire and terminate those officers and employees and had the authority and discretion to appoint, monitor, and remove officers and employees in their individual fiduciary rules with respect to the Plan. Accordingly, the actions of the Board of Directors, the Company's committees and other employee fiduciaries are imputed to Monster Worldwide under the doctrine of respondeat superior.

16.    Monster Worldwide is the Plan Sponsor of the Plan within the meaning of ERISA.

17.     Monster Worldwide is a named or <u>de facto</u> fiduciary of the Plan within the meaning of ERISA and is the Plan's Administrator as that term is defined under the statute. Further, the Company exercises discretionary authority with respect to managing and administering the Plan and its assets.

**Director Defendants**

18.     The Board of Directors, as the exclusive acting arm of Monster Worldwide, has primary responsibility for fiduciary oversight of the Plan.  The Board, at all applicable times, had effective control over the activities of the members of the Monster Worldwide 401(k) Committee (also known as the Monster Worldwide, Inc. 401(k) Savings Plan Administrative Committee) (the "Committee").  Moreover, the Board appointed members of the Committee.  <u>See, e.g.</u>, Summary Plan Description, Sept. 18, 2003, § 10.1 ("the general administration of the Plan on behalf of the Plan Administrator shall be placed in a Committee of not less than two (2) members.  The members of the Committee shall be appointed by the Board of Directors of the Company and each such member shall serve at the pleasure of such Board.")

19.     The Board was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to managing and administering the Plan and managing and disposing of the Plan's assets.

20.     The following parties, sometimes referred to herein as the "Director Defendants," served during the Class Period as members of the Board of Directors of Monster Worldwide as follows:

21.     Defendant Andrew J. McKelvey ("McKelvey") was the Chairman of the Board, Chief Executive Officer and a Director since founding the Company in 1967.  He resigned as

6

Monster's Chief Executive Officer in the Fall of 2006 and later resigned as a Director of Monster after refusing to be interviewed by lawyers conducting an internal investigation of illegal options backdating at Monster. ***Based on his knowledge of material non-public information regarding the Company, Defendant McKelvey sold 14.83 million shares of Monster stock for proceeds of $342.3 million.***

22.     Upon information and belief, McKelvey was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) managing and administering of the Plan; and/or (ii) managing and depositing of the Plan's assets. Further, as of April 15, 1997, Defendant McKelvey owned 63.0% of the Company's common stock, including over 14.79 million shares of Class B shares, which were convertible on a share for share basis into Class A Common Stock. Each share of Class B Common Stock is entitled to ten votes per share. As of March 31, 2006, Defendant McKelvey owned 5.8% of the Company's Class A Common Stock, which combined with his 4.76 million Class B shares, gave him approximately 32% of the combined voting power of the Company's shares. Through his significant share ownership, Defendant McKelvey controlled the business and financial affairs of the Company and controlled the appointment and election of the other Directors to the Monster Board. Defendant McKelvey has publicly stated to the press that he is "completely responsible" for any wrongdoing in connection with the Company's historical stock option grants.

23.     Defendant McKelvey is a fiduciary of the Plan because he signed fiduciary communications on behalf of the Plan including SEC filings such as the Plan's Annual Reports Form 11-K dated June 28, 2006; June 29, 2005; June 28, 2004 and June 30, 2003. Defendant McKelvey also signed other SEC filings that are specifically incorporated into the Plan

documents, including the Company's Forms 10-K, 10-Q and 8-K.

24.     Defendant George R. Eisele ("Eisele") has been a Director of the Company since September 1987. ***Defendant Eisele was the recipient of at least 14,935 (split-adjusted) Monster stock options, with purported grant dates of December 9, 1998, December 1, 1999 and April 4, 2001, which were backdated.*** Upon information and belief, Defendant Eisele was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Defendant Eisele also was a fiduciary of the Plan because he signed fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

25.     Defendant John R. Gaulding ("Gaulding") has been a Director of the Company since June 2001. Based on his knowledge of material nonpublic information regarding the Company, Defendant Gaulding sold 15,004 shares of Monster stock for proceeds of $609,587. Upon information and belief, Defendant Gaulding was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Defendant Gaulding also was a fiduciary of the Plan because he signed fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference. Further, Defendant Gaulding has been a member of the Company's Audit Committee and Compensation Committee during the Class Period (except for 2000), and therefore, he approved the Company's financial statements, which were materially false and misleading with respect to disclosure and accounting for stock option grants, and he had primary

8

responsibility under the Company's stock option plans to administer and approve stock option grants in accordance with the plans' express terms. Rather than fulfill these and other important fiduciary duties, Defendant Gaulding violated his fiduciary duties by approving and/or otherwise permitting the backdated stock options at issue in this case in direct violation of the Company's stock option plans.

26.     Defendant John Swann ("Swann") has been a Director of the Company since September 1, 1996. *Defendant Swann was also the recipient of at least 10,667 (split-adjusted) Monster stock options, with a purported grant date of April 4, 2001, which were backdated.* Upon information and belief, Defendant Swann was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Further, Defendant Swann is a member of the Company's Compensation Committee and Nominating Committee. As a member of the Compensation Committee (in 1997 and from 2004 through the present), Defendant Swann had primary responsibility under the Company's stock option plans to administer and approve stock option grants in accordance with the plans' express terms. Also, as a Monster Board member, Defendant Swann approved the Company's financial statements during the Class Period, which were materially false and misleading with respect to disclosing and accounting for stock option grants. Defendant Swann also was a fiduciary of the Plan because he signed communications to Plan Participants during the Class Period including SEC filings that the Plan documents incorporated by reference. Rather than fulfill these and other important fiduciary duties, Defendant Swann violated his fiduciary duties by approving and/or

9

otherwise permitting the backdated stock options at issue in this case in direct violation of the Company's stock option plans.

27.      Defendant Michael Kaufman ("Kaufman") has been a Director of the Company since October 1997. ***Defendant Kaufman was also the recipient of at least 10,667 (split-adjusted) Monster stock options, with a purported grant date of April 4, 2001, which were backdated.*** Upon information and belief, Defendant Kaufman was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Defendant Kaufmann also was a fiduciary of the Plan because he signed communications to Plan Participants during the Class Period including SEC filings that the Plan documents incorporated by reference. Further, Defendant Kaufman is Chairman of the Company's Compensation Committee and a member of its Audit Committee. As a member of the Compensation Committee (from 1998 through the present), Defendant Kaufman had primary responsibility under the Company's stock option plans to administer and approve stock option grants in accordance with the plans' express terms. Also, as a member of the Company's Audit Committee (from 2000 through the present), Defendant Kaufman approved the Company's financial statements during the Class Period, which were materially false and misleading with respect to disclosure and accounting for stock option grants. Rather than fulfill these and other important fiduciary duties, Defendant Kaufman violated his fiduciary duties by approving or otherwise permitting the backdated stock options at issue in this case in direct violation of the Company's stock option plans and the disclosures to the Plan and its participants.

10

28.    Defendant Ronald J. Kramer ("Kramer") has been a Director of the Company since February 2000. ***Defendant Kramer was also the recipient of at least 10,667 (split-adjusted) Monster stock options, with a purported grant date of April 4, 2001, which were backdated.*** Upon information and belief, Defendant Kramer was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Defendant Kramer also was a fiduciary of the Plan because he signed communications to Plan Participants during the Class Period, including SEC filings that the Plan documents incorporated by reference. Further, Defendant Kramer is Chairman of the Company's Audit Committee and a member of its Compensation Committee. As a member of the Compensation Committee (from 2000 through the present), Defendant Kramer had primary responsibility under the Company's stock option plans to administer and approve stock option grants in accordance with the plans' express terms. Also, as a member of the Company's Audit Committee (from 2000 through the present), Defendant Kramer approved the Company's financial statements during the Class Period, which were materially false and misleading with respect to disclosure and accounting for stock option grants. Rather than fulfill these and other important fiduciary duties, Defendant Kramer violated his fiduciary duties by approving and/or otherwise permitting the backdated stock options at issue in this case in direct violation of the Company's stock option plans.

29.    Defendant David A. Stein ("Stein") has been a Director of the Company since June 2003. Upon information and belief, Defendant Stein was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management

11

and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Defendant Stein also was a fiduciary of the Plan because he signed communications to Plan Participants during the Class Period, including SEC filings that the Plan documents incorporated by reference.  Further, Defendant Stein is Chairman of the Company's Nominating Committee. Defendant Stein also was a fiduciary of the Plan because he signed communications to Plan Participants during the Class Period including SEC filings that the Plan documents incorporated by reference.  As a Monster Board member, Defendant Stein approved the Company's financial statements during the Class Period which were materially false and misleading with respect to disclosure and accounting for stock option grants.  Rather than fulfill these and other important fiduciary duties, Defendant Stein violated his fiduciary duties and approved and/or otherwise permitted the backdated stock options at issue in this case in direct violation of the Company's stock option plans.

**The Option Defendants**

30.    In addition to the Director Defendants, the following defendants (sometimes referred to as the "Option Defendants") were officers of Monster, signed fiduciary communications during the Class Period that were materially false and misleading, and received significant stock option grants that were illegally backdated.

31.    Defendant James J. Treacy ("Treacy") joined Monster in 1994 as Chief Executive Officer of the Advertising and Communications Division.  In April 1996, Defendant Treacy was named Executive Vice President-Finance and Strategy.  In February 1998, in addition to his then current position, Defendant Treacy was named Chief Operating Officer.  In October 1998, he became a director of the Company.  During the Relevant Period, ***Defendant Treacy was granted***

*at least 851,555 (split-adjusted) Monster stock options that were improperly backdated*.
Defendant Treacy left employment at Monster in 2002.  Defendant Treacy was a fiduciary of the
Plan because he signed communications to Plan Participants during the Class Period, including
SEC filings that the Plan documents incorporated by reference.  Defendant Treacy signed SEC
filings that are specifically incorporated into the Plan documents, including the Company's
Forms 10-Q.

32.     Defendant Jeffrey C. Taylor ("Taylor") joined the Company in November 1995.
Taylor was founder and president of Adion, Inc., a recruitment adverting firm, from May 1989
until its purchase by the Company in November 1995.  Defendant Taylor founded the Monster
Board in April 1994 and launched TMP Interactive in 1995.  Defendant Taylor left his
employment at the Company in June 2005.  *Based on his knowledge of material non-public*
*information regarding the Company, during the Class Period, Defendant Taylor was granted*
*at least 2,520,052 (split-adjusted) Monster stock options that were improperly backdated.*

33.     Defendant Thomas G. Collison ("Collison") is the former Vice Chairman and
Secretary of the Company.  He joined the Company in February 1977 as Controller.  Defendant
Collison was subsequently named Vice President-Finance, Senior Vice President, Executive Vice
President and Chief Financial Officer and, in March 1996, Vice Chairman.  *During the Class*
*Period, Defendant Collison was granted at least 113,780 (split-adjusted) Monster stock options*
*that were improperly backdated*.

34.     Defendant Paul M. Camara ("Camara") joined the Company in February 1970.
Defendant Camara was elected as a Vice President of the Company in 1978 and as a Senior Vice
President in 1987.  He was named to his current position, Executive Vice President of Creative,

13

Sales, & Marketing, in April 1996. *During the Class Period, Defendant Camara was granted at least 758,399 (split-adjusted) Monster stock options that were improperly backdated.*

35.     Defendant John McLaughlin ("McLaughlin") is currently the Executive Vice President of Monster Worldwide. Defendant McLaughlin is a 19-year veteran of Monster Worldwide and predecessor companies. Defendant McLaughlin is responsible for the human capital management practices and policies of the organization and reports to Defendant McKelvey. *During Class Period, Defendant McLaughlin was granted at least 255,354 (split-adjusted) Monster stock options that were improperly backdated.*

36.     Defendant Myron F. Olesnyckyj ("Olesnyckyj") has been Corporate Secretary, Senior Vice President and General Counsel of Monster and has been with the Company since 1994. *During the Class Period, Defendant Olesnyckyj was granted at least 88,845 (split-adjusted) Monster stock options that were improperly backdated.* Defendant Olesnyckyj signed SEC filings that are specifically incorporated into the Plan documents, including the Company's Forms 8-K.

37.     Defendant Olesnyckj was a fiduciary of the Plan because throughout the Class Period he was the authorized representative of the Company, the Board and the Committee who executed amendments to the Plan and certified and adopted those amendments "in the name and on behalf of the Corporation [Monster]".

38.     On November 23, 2006, Monster announced that it had terminated Defendant Olesnyckj "for cause" as part of its investigation into illegal options back-dating practices. On January 18, 2007 a <u>Wall Street Journal</u> article reported that federal prosecutors were intensifying their criminal probe in the options backdating at the Company prompted in part by e-mails

14

written by Olesnyckyj suggesting that he knew about the improper backdating and discussed with other high-level Company officers how to "finesse" the Company's outside auditors.

39.     As alleged below, on February 15, 2007, Defendant Olesnyckyj entered a guilty plea to conspiracy and securities fraud charges arising from his role in the illegal options backdating scheme at the Company.

40.     Defendant Michael E. Sileck ("Sileck") joined Monster in March 2002 and became the Company's Senior Vice President and CFO. *During the Class Period, Defendant Sileck was granted at least 445,405 (split-adjusted) Monster stock options that were improperly backdated.* Defendant Sileck resigned from his positions at the Company effective March 14, 2005, and pursuant to his separation agreement, all of his stock options became vested and exercisable. Defendant Sileck signed SEC filings that are specifically incorporated into the Plan documents, including the Company's Forms 10-K, 10-Q, and 8-K.

41.     Defendant Peter Dolphin ("Dolphin") joined the Company in January 1996 as Chairman of the Company's U.K. Advertising & Communications operations. Defendant Dolphin was recently appointed Group President, Europe for TMP Worldwide as part of the Company's strategic reorganization. *During the Class Period, Mr. Dolphin was granted at least 40,215 (split-adjusted) Monster stock options that were improperly backdated.*

42.     Defendant Brian Farrey ("Farrey") joined the Company in July 1999 as Chief Technology Officer of the Company's Monster division. In March 2002, Defendant Farrey was appointed to his current position, President of Monster Worldwide Technologies. *During the Class Period, Defendant Farrey was granted at least 74,667 (split-adjusted) Monster stock options that were improperly backdated.*

43.     Defendant Steve Pogorzelski ("Pogorzelski") joined the Company in 1992 in the Advertising & Communications division, where he served from 1992 to December 1998. In December 1998, Defendant Pogorzelski joined the Monster division and served as Executive Vice President of Global Sales until April 2001. From April 2001 to September 2005, he served as President of Monster North America. Currently, Defendant Pogorzelski's position is Group President, International. *During the Class Period, Defendant Pogorzelski was granted at least 106,698 (split-adjusted) Monster stock options that were improperly backdated.*

44.     Defendant Robert J. O'Connell ("O'Connell") joined Monster.com in April 1997 and served as COO before being promoted to Group President-Finance, Human Resources & Administration. As COO of Monster.com, Defendant O'Connell helped oversee the 1999 merger of Online Career Center and the Monster Board. Prior to joining Monster.com, Defendant O'Connell served as Senior Vice President of Finance for TMP Worldwide Inc. *During the Class Period, Defendant O'Connell was granted at least 53,866 (spit-adjusted) Monster stock options that were improperly backdated.*

45.     Defendant Brad Baker ("Baker") has served as the Company's President of Product, Technology and Service since December 16, 2005. Prior to that, Defendant Baker served as the Company's Chief Product and Marketing Officer and as Senior Vice President of Product and Marketing. Before joining the Company, Defendant Baker was a co-founder of Making It Count, which was acquired by Monster in June 2001. *During the Class Period, Defendant Baker was granted at least 18,137 (split-adjusted) Monster stock options that were improperly backdated.* Defendant Baker signed SEC filings that are specifically incorporated into the Plan documents, including the Company's Forms 10-K, 10-Q, and 8-K.

16

46.     Defendant Chris G. Power ("Power") joined the Company in April 2002 as CFO of the Monster North America division.  Defendant Power was promoted to the role of CFO for Monster Worldwide North America operations in February 2003 and was appointed to his current position, CFO of Global Operations in March 2005.  *During the Class Period, Defendant Power was granted at least 15,000 (split-adjusted) Monster stock options that were improperly backdated*.

47.     Defendant David A. Hosokawa ("Hosokawa") was Vice Chairman of the Company in 1997 and 1998.  *During the Class Period, Defendant Hosokawa was granted at least 265,513 (split-adjusted) Monster stock options that were improperly backdated*.

48.     Defendant Stuart J. McKelvey ("S. McKelvey") served as President-Directional Marketing of Monstermoving (a relocation website division of TMP Worldwide) through June 1, 2005, when such division was sold to a third party.  Defendant S. McKelvey is the son of Director Defendant Andrew J. McKelvey, the Company's Founder and former Chairman of the Board and CEO.  *During the Class Period, Defendant S. McKelvey was granted at least 5,333 (split-adjusted) Monster stock options that were improperly backdated.*

49.     Defendant William M. Pastore ("Pastore") has been Chief Operating Officer ("COO") of Monster since 2002 and President since 2006.  *Based on his knowledge of material non-public information regarding the Company, Defendant Pastore sold 599,099 shares of Monster stock for proceeds of $21.41 million.*  Defendant Pastore signed SEC filings that are specifically incorporated into the Plan documents, including the Company's Forms 10-Q.

50.     Defendant Jonathan Trumbull ("Trumbull") was appointed Global Controller and Chief Accounting Officer of Monster in March 2005.  Previously, Trumbull served as Vice

17

President and Corporate Controller of Monster in 2002. ***Based on his knowledge of material non-public information regarding the Company, Defendant Trumbull sold 12,500 shares of Monster stock for millions of dollars in proceed.*** Defendant Pastore signed SEC filings that are specifically incorporated into the Plan documents, including the Company's Forms 8-K.

## Monster Worldwide, Inc. 401(k) Savings Plan Administrative Committee

51.    Defendant Monster Worldwide, Inc. 401(k) Committee, also known as the Monster Worldwide, Inc. 401(k) Savings Plan Administrative Committee (the "Committee") consisted of various officers and employees who managed the operation and administration of the Plan. The Committee is a named fiduciary of the Plan. The Committee exercised discretionary authority and discretionary control with respect to the management and administration of the Plan and exercised authority or control with respect to managing the Plan's assets.

52.    The Committee had the responsibility for selecting, evaluating, monitoring and altering the makeup of the investment alternatives provided under the Plan.

53.    Defendant Patrick Harrington ("Harrington") was at all times Monster Worldwide's Vice President of Tax and a member of the Committee. Throughout the Class Period, Defendant Harrington signed Plan documents on behalf of the Plan, including the annual reports on Form 5500 filed by the Plan for 2000 through 2005 and he identified himself on those forms as the Plan Administrator.

54.    Defendant Greg Limoges ("Limoges") was at all times an employee of Monster Worldwide and a member of the Committee. Defendant Limoges signed documents, including

communications, on behalf of the Plan, including the Form 5500 filed by the Plan for 2005, dated October 11, 2006, in which he identified himself as the Plan Administrator.

**Unknown Fiduciaries**

55.      There are fiduciaries of the Plan whose identities are currently unknown to Plaintiff. These unknown individuals include members of the Committee.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

56.      Defendants include named and de facto fiduciaries with respect to the Plan.  All Defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

**THE PLAN**

57.      The Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. § 1002(3) and 1002(2)(A).  The Plan is a legal entity which can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action, Plaintiff, who is described above, seeks relief on behalf of the Plan.

58.      The Plan was adopted as of January 1, 1992 for the benefit of its eligible employees and the eligible employees of any other organization designated by the Monster Worldwide Board.

59.      The Plan is a defined contribution plan and provides for elective contributions on the part of the participating employees and employer matching contributions.  The Plan extends

19

coverage to each employee of the participating employers, except those employees covered by a collective bargaining agreement where the agreement does not specifically provide for the participation in the Plan of the employees subject to that bargaining agreement, leased employees or nonresident aliens with no U.S. source income.

60.     The Plan has designated Monster Worldwide as the Plan Administrator.

61.     Between 1992 and 2001 there were thirteen amendments to the Plan affecting vesting, eligibility, employee coverage, compensation and the source of matching funds.

62.     Since then there have been some additional amendments to the Plan in order to reflect changes of law (such as the Economic Growth and Tax Relief Reconciliation Act of 2001 and Internal Revenue Service Regulations concerning minimum distribution requirements) and to account for changes to the Company's subsidiaries and affiliates (such as the spin-off of the Company's eResourcing and Executive Search Divisions).

63.     The Plan also was amended to change the percentage of compensation that participating employees could contribute to the Plan and the match by the Company.

64.     For example, before January 1, 2004, participating employees could contribute up to 15% of their compensation (subject to the ERISA and IRS limits) and the Company would make matching contributions equal to the elective contributions but not more than 20% of each contributing employee's eligible compensation.

65.     According to the Plan's Annual Report on Form 11-K for 2002, the Company's matching contribution would be made by purchasing units in the Monster Worldwide 401(k) Equity Unit Fund (the "Monster Stock Fund") which, in turn, purchases shares of the Company's common stock.

66.     Effective January 1, 2004 the Plan was amended to allow participants to contribute up to 30% of their compensation (subject to ERISA and IRS limitations) and to eliminate the need for new employees to wait before entering the Plan.  The amendment also provided for matching contributions to be funded on a quarterly basis.

67.     Effective January 1, 2005, the Plan was amended to provide that new employees would be automatically enrolled in the Plan.  The employer match was also changed so that the Company would make matching contributions equal to 50% of the participant's elective contributions but not more than 6% of their eligible compensation.

68.     According to the Plan's annual report on Form 11-K for the year ended December 31, 2005:

> The employer's matching contribution is generally made by the Company issuing Monster Worldwide, Inc. common stock to the Plan's Monster Worldwide 401(k) Equity Unit Fund.

69.     On January 1, 2006, the Plan was amended to increase the limit on participant contributions to 50% of eligible compensation (subject to IRS and ERISA limits).

## THE DEFENDANTS' FIDUCIARY STATUS

70.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

71.     During the Class Period, Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA,  29 U.S.C.  § 1002(21)(A), and the law interpreting that section.

72.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, Monster Worldwide chose to internalize its respective fiduciary functions.

21

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated

(the "Class"):

> All persons who were participants in or beneficiaries of the Plan at
> any time between 2000 through the present (the "Class Period) and
> whose accounts held Company stock or units in the Monster Stock
> Fund.

74.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

and can only be ascertained through appropriate discovery, the Plan's filings with the DOL on

Form 5500 reveal that these are at a minimum thousands of members of the Class who

participated in, or were beneficiaries of the Plan during the Class Period.

75.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and members

of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and members

of the Class by failing to act prudently and solely in the interests of the Plan's Participants and

beneficiaries; and

(c)     whether Defendants violated ERISA.

76.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

78.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

79.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### The Company's Stock Option Plan

80.     Between at least 1997-2005, Monster granted stock options to its officers,

directors and employees pursuant to at least two different stock option plans:  the 1996 Stock

Option Plan ("1996 Plan") and the 1999 Long Term Incentive Pan ("1999 Plan").   The plans had

been prepared by Monster's management and adopted by the Board of Directors and voted upon

and approved by Monster shareholders.

### The 1996 Plan

81.     In January 1996, the Company's Board of Directors adopted the 1996 Plan, which

is set forth in the Company's Proxy statement filed with the SEC on April 28, 1997.  The express

purpose of the 1996 Plan was "to enable TMP Worldwide Inc, and its stockholders to secure the

benefit of the incentives inherent in common stock ownership by present and future officers and

other employees and personnel of . . . the Company."

82.     The 1996 Plan provided for the issuance of both incentive stock options and stock

options that are not treated as an incentive stock option.  The per share exercise price of an

incentive stock option granted under the 1996 Plan may not be less than the fair market value of

the common stock of the Company on the date of grant.  Incentive stock options granted to

persons who have voting control over 10% or more of the Company's capital stock (*i.e.*, Director

Defendant McKelvey) are granted at an exercise price of not less than 110% of the fair market

value of the underlying shares on the date of the grant.  The exercise price of stock options that

24

are not treated as incentive stock options granted under the 1996 Plan *may not be less than the fair market value* of the common stock of the Company on the date of the grant. The "fair market value" is defined as the closing price of the stock. See 1996 Plan, ¶ V(a).

83.      The 1996 Plan further provided that a committee (the "Plan's Committee") would have the sole and absolute discretion to grant options under the 1996 Plan, to interpret the provisions of the 1996 Plan, to fix and interpret the provisions of options agreements made under the Plan, to supervise the administration of the Plan, and to take such other action as may be necessary or desirable in order to carry out the provisions of the 1996 Plan. See 1996 Plan, ¶ 3. The Plan's Committee could either be composed of the entire Board, or two independent directors. The Board authorized the Compensation Committee of the Board to administer the 1996 Plan.

84.      In the years before the adoption of a new plan in 1999, the members of the Compensation Committee were Director Defendants Gaulding and Swann in 1996 and 1997, and Director Defendants Gaulding and Kaufman in 1998 and 1999.

85.      Options granted under the 1996 Plan were required to be evidenced by a written agreement in a form approved by the Plan's Committee (*i.e.*, the Compensation Committee) and had a maximum term of ten years. Accordingly, the backdated options that were purportedly granted in 1997, set forth below, were approved by Director Defendants Gaulding and Swann, and the backdated options that were purportedly granted in 1998 and 1999 pursuant to the 1996 Plan, also set forth below, were approved by Director Defendants Gaulding and Kaufman.

86.      The 1996 Plan limited the number of options to be granted to a single individual to 45,000, and the total number of options to be granted by the Company to 900,000. Due to

25

subsequent amendments to the 1996 Plan, discussed below, the total amount of shares available

for option grants under the 1996 Plan was first increased from 900,000 to 1.8 million (in 1997),

and then from 1.8 million to 3 million (in 1998).

87.     The 1996 Plan was limited to employees of the Company and did not include non-

employee directors, commonly referred to as outside directors.  Options granted to non-employee

directors were subject to the 1996 Stock Option Plan for Non-Employee Directors (the "1996

Non-Employee Directors Plan" collectively with the "1996 Plan" the "1996 Plans").  The terms

and conditions of that plan were similar to the 1996 Plan.  The exercise price of each option

granted had to be "the Fair Market Value" (*i.e.*, the closing price) of the common stock covered

by such option "on the Grant Date."  The options also had a ten year term and were evidenced by

a written agreement.  The 1996 Non-Employee Directors Plan limited the total number of options

available for grant to 10,000 shares.  Under the 1996 Non-Employee Directors Plan,

non-employee directors were to receive an option to purchase 625 shares of the Company's stock

on their date of initial election or appointment to the Monster Board.

**The 1999 Plan**

88.     On or about December 9, 1998, the Compensation Committee – *i.e.*, Director

Defendants Gaulding and Kaufman – adopted the 1999 Plan.  Pursuant to Proxy Statements filed

with the SEC in April and May of 1999, the Company solicited, and was subsequently granted,

shareholder approval of the 1999 Plan.

89.     The 1999 Plan included employees and outside directors.  It also significantly

increased the maximum number of options allowed to be awarded to one person in any calendar

year to one million, and increased the total number of shares that could be issued from 3 million

to 15 million.  In addition, the 1999 Plan increased the number of options to be awarded to new

non-employee directors from 625 to 11,250, and provided that such "outside directors" would

receive annual options to purchase 2,500 shares of common stock.  Defendants have since

doubled these numbers to 22,500 and 5,000, respectively, following the Company's March 2000

2-for-1 stock split.

90.     Significantly, the 1999 Plan left intact the authority of the Compensation

Committee to grant both incentive stock options and stock options that do not qualify as

incentive stock options, as well as the requirement that the exercise price of the incentive stock

options "***may not be less than 100% of the fair market value***" (*i.e.*, the closing price) of a share

of common stock on the date of grant.  Similarly, owners of 10% or more of the voting power of

all classes of stock of the Company still could not be granted incentive stock options at less than

110% of the fair market value of the stock on the date of the grant.  See 1999 Plan, ¶ 5(c).

91.     As under the 1996 Plan, the options had a ten year term and were required to be

evidenced by a written agreement.  Unless the compensation Committee determined otherwise,

no option could be exercised within six months after the date the option was granted and each

option was subject to a four-year vesting schedule pursuant to which the option would generally

become 25% vested on each of the first four anniversaries of the date of grant, subject to

continued employment.  Upon approval of the 1999 Plan, Monster committed to no longer

making grants pursuant to the 1996 Plan.

92.     The 1999 Plan also provided that it would be administered by a committee of two

or more members of the Monster Board – *i.e.*, the Compensation Committee.  See 1999 Plan, ¶¶

2(a)-(b).  Thus, backdated options granted in 1999 were granted by Director Defendants

27

Gaulding and Kaufman, those granted in 2000 were granted by Director Defendants Kaufman

and Kramer, and all subsequently granted options were granted by Director Defendants Gaulding,

Kaufman and Kramer.

**Monster's By-Laws**

93.     The By-Laws of Monster authorized the Board of Directors and/or Compensation

Committee to act formally on option grant proposals one of two ways: The Board of Directors

and/or Compensation Committee could act without a formal meeting if all members of the Board

or Committee consented in writing to the adoption of a resolution authorizing the action.  This is

known as "unanimous written consent."  Alternatively, the Board of Directors and/or

Compensation Committee could act by holding a meeting at which a quorum of the Board or

Committee members was present, if a majority of those present at the meeting approve the

action.

94.     For certain Monster option grants made during the Class Period, the Board of

Directors and/or Compensation Committee acted through unanimous written consents, and not

through a formal meeting of the Board of Directors or Compensation Committee members.

**Monster's Stock Option Accounting Policy**

95.     Defendants represented that Monster accounted for stock options using the

intrinsic method described in Accounting Principles Board Opinion No. 25, "Accounting for

Stock Issued to Employees" ("APB 25 ").  See, e.g., 1997 Form 10-K ("The Company applies

[APB 25] and related Interpretations in accounting for its employee stock options.  Under APB

25, because the exercise price of the Company's employee stock options equals the market price

28

of the underlying stock on the date of grant, no compensation expense is recognized.");

1998-2005 Forms 10-K (same).

96.     Under APB 25, Monster was required to record as an expense on its financial

statements the "intrinsic value" of a fixed stock option on its "measurement date." An option

that is "in-the-money" on the measurement date has intrinsic value, and the difference between

its exercise price and the quoted market price must be recorded as compensation expense to be

recognized over the vesting period of the option.  Options that are "at-the-money" or

"underwater" on the measurement date need not be expensed.

**Monster's Compensation Committee**

97.     According to Monster's 2006 Proxy Statement, the Compensation Committee is

charged with recommending to the Board of Directors the compensation for the Company's

executives and administering the Company's stock incentive and benefit plans.  The Charter of

the Compensation Committee of the Monster Board more specifically describes the Committee's

duties and responsibilities as follows:

> The Committee shall have the following primary duties and
> responsibilities, and shall perform any other activities consistent
> with this charter, the Corporation's bylaws and governing law as
> the Committee or the Board may deem appropriate or necessary:
>
> The Committee shall have oversight of the Corporation's
> overall compensation and benefit philosophy.
>
> The Committee shall review and approve the compensation
> arrangements of the Chief Executive Officer and the other
> executive officers of the Corporation, including without limitation
> base salary, incentive bonuses and awards, awards under
> compensation or equity plans, employment agreements, severance
> arrangements, and change in control provisions, in each case as and
> when appropriate.

29

The Committee shall make recommendations to the Board concerning adopting and amending incentive compensation plans applicable to executive officers generally and equity compensation plans for all employees.

The Committee shall fix and determine awards to officers and employees of stock, stock options, shares of stock, stock appreciation rights and other equity interests pursuant to any of the Corporation's equity compensation plans from time to time in effect and exercise such other power and authority as may be permitted or required under such plans. The Committee may provide for the delegation of these functions as permitted by the respective plans and applicable law.

The Committee shall produce an annual report on executive compensation for inclusion in the Corporation's proxy statement in accordance with applicable rules and regulations.

The Committee shall periodically review and make recommendations to the Board with respect to the compensation of directors, including Board and committee retainers, meeting fees, equity-based compensation, and such other forms of compensation as the Committee may consider appropriate.

The Committee shall periodically provide to the Board written or oral summaries of the Committee's activities and proceedings.

The Committee shall exercise any fiduciary, administrative or other function assigned to the Committee under any of the Corporation's benefit plans.

The Committee shall periodically review and reassess the adequacy of this charter and recommend any proposed changes to the Board for approval.

98.    At all relevant times, Director Defendants Gaulding (1997-1999, 2002-2006), Kaufman (1999-2006), Kramer (2001-2006), and Swann (1997-1998, 2005-2006) served on the Compensation Committee.

99.    Pursuant to Monster's Proxy Statements during the Class Period, the

30

Compensation Committee was directly responsible for determining the stock option awards that are the subject of this action, in the amounts set forth below.

**Monster's Audit Committee**

100.   According to Monster's 2006 Proxy Statement, the Audit Committee is charged with appointing the Company's independent auditors as well as discussing and reviewing with the independent auditors the scope of the annual audit and results thereof, pre-approving the engagement of the independent auditors for all audit-related services and permissible non-audit related services, and reviewing and approving all related-party transactions. The Audit Committee also reviews interim financial statements included in the Company's quarterly reports and reviews documents filed with the SEC.

101.   The Charter of the Audit Committee of the Monster Board more specifically describes the Committee's duties and responsibilities as follows:

> The Committee has been established to: (a) assist the Board in its oversight responsibilities regarding (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent accountants' qualifications and independence and (4) the performance of the Company's internal audit function; (b) prepare the report required by the [SEC] for inclusion in the Company's annual proxy statement; (c) retain and terminate the Company's independent accountants; (d) approve audit and non-audit services to be performed by the independent accountants; and (e) perform such other functions as the Board may from time to time assign to the Committee. In performing its duties, the Committee shall seek to maintain an effective working relationship with the Board, the independent accountants, the internal auditors and management of the Company.

102.   Director Defendants Kramer (2001-2006), Gaulding (1 997- 2006), Kaufman (2001 -2006), and Swann (1997-1999) served on the Audit Committee.

31

103.    The members of the Audit Committee had a duty to know and understand the material information regarding stock option grants as well as to oversee the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements, and to assist the Board of Directors in its oversight of the Company's financial reporting, among other duties.

104.    Defendants who were members of the Audit Committee violated their fiduciary duties by failing to act and failing to disclose that Monster's financial statements contained materially false or misleading statements and by making or omitting material facts regarding Defendants' options backdating practices.

**Stock Option Grants to Defendants**

105.    Between fiscal years 1997 and 2002, the Board and its Compensation Committee granted, backdated or otherwise manipulated Monster stock options to the Option Defendants, as follows:

**1997 Option Grants**

106.    In 1997, the Company issued approximately 3,698,640 split-adjusted Monster stock options to Option Defendants Hosokawa, Treacy, Taylor, Collison, Camara, Olesnyckyj, and Dolphin, as well as other grantees, including the following:

| Date of Grant | Recipient | No. of Options Granted | Exercise Price | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 01/06/97 | Hosokawa | 124,459 | $12.875 | $6.03 | 265,5 13 |
| 01/06/97 | Treacy | 66,666 | $12.875 | $6.03 | 142,221 |
| 01/06/97 | Taylor | 26,125 | $12.875 | $6.03 | 55,733 |
| 01/06/97 | Collison | 13,334 | $12.875 | $6.03 | 28,446 |

32

| 01/06/97 | Olesnyckyj | 15,146 | $12.875 | $6.03 | 32,311 |
|---|---|---|---|---|---|
| 01/06/97 | Add'l Recipients | 958,007 | $12.875 | $6.03 | 2,043,748 |
| **Total** | | **1,203,737** | | | **2,567,972** |
| 12/12/97 | Treacy | 5,000 | $15.00 | $7.03 | 10,667 |
| 12/12/97 | Taylor | 55,000 | $15.00 | $7.03 | 117,333 |
| 12/12/97 | Collison | 5,000 | $15.00 | $7.03 | 10,667 |
| 12/12/97 | Camara | 5,000 | $15.00 | $7.03 | 11,733 |
| 12/12/97 | Olesnyckyj | 3,000 | $15.00 | $7.03 | 6,400 |
| 12/12/97 | Dolphin | 6,351 | $15.00 | $7.03 | 13,548 |
| 12/12/97 | Add'l Recipients | 450,149 | $15.00 | $7.03 | 1,045,65 1 |
| **Total** | | **530,000** | | | **1,130,667** |
| **Grand Total** | | **1,733,737** | | | **3,698,640** |

107.    Option Defendant Hosokawa, Treacy, Taylor, Collison and Olesnyckyj received approximately 245,730 options, purportedly granted on January 6, 1997, with a strike price of $12.875 – the lowest closing price for Monster common stock for the entire fiscal and calendar year.  In addition, other employees of Monster received a total of 958,007 options, all with the same purported January 6, 1997 grant date and the same favorable $12.875 strike price.

108.    Defendants stated in the Company's Proxy Statement filed with the SEC on April 28, 1997, that "[o]n January 6, 1997, options to purchase an aggregate 1,203,737 shares were granted subject to stockholder approval to amend the Stock Option Plan."  The same Proxy stated that, "[o]n January 6, 1997, the Compensation Committee of the Board of Directors unanimously

33

adopted, subject to stockholder approval, amendments to the Company's 1996 Stock Option Plan
. . . which would increase the maximum annual stock option grant to any individual from 45,000
to 150,000 and which would increase the aggregate number of shares of Common Stock which
may be issued under the Stock Option Plan from 900,000 to 1,800,000 shares." However, given
that the January 6, 1997 grant was backdated to the day of the lowest closing price of the year, it
is highly unlikely that the Compensation Committee - *i.e.*, Director Defendants Gaulding and
Swann – also approved the grant and the amendment to the 1996 Plan on that date.

109.    Option Defendants Treacy, Taylor, Collison, Camara, Olesnyckyj and Dolphin
received at least 79,851 options purportedly granted on December 12, 1997, with a strike price of
$15.00 -- *the lowest closing price for Monster common stock for the second half of 1997.*
Indeed, during the twenty days preceding the purported grant, Monster's stock price declined by
25.93% and during the twenty days following the purported grant, it increased by 56.67%. In
addition, other employees of Monster received a total of 450,149 options, all with the same
purported December 12, 1997 grant date and the same favorable $15.00 strike price.

110.    With respect to this purported grant date of December 12, 1997, Defendants stated
in the Company's Proxy Statement filed with the SEC on April 21, 1998, that "[o]n December
12, 1997, options to purchase an aggregate of approximately 530,000 shares were granted,
subject to shareholder approval to amend the aggregate number of options that may be granted
under the Stock Option Plan." The same Proxy further stated that, "[o]n December 12, 1997, the
Compensation Committee of the Board of Directors unanimously adopted, subject to stockholder
approval, an amendment to the Company's 1996 Stock Option Plan . . . which would increase the
aggregate number of shares of common stock which may be issued under the Stock Option Plan

34

from 1,800,000 to 3,000,000 shares." However, given that the December 12, 1997 grant was backdated to the day of the lowest closing price for the second half of the year, it is highly unlikely that the Compensation Committee, Director Defendants Gaulding and Swam, in fact approved the grant and the amendment to the 1996 Plan on that very date.

111.   A graph demonstrating the purported timing of the 1997 grants is as follows:



## 1998 Option Grants

112.   In 1998, the Company issued approximately 1,706,667 split-adjusted Monster stock options to Defendants Treacy, Taylor, Camara, Eisele, as well as other grantees, including Director Defendant McKelvey's son, Option Defendant S. McKelvey, purportedly as follows:

| Date of Grant | Recipient | No. of Options Granted | Exercise Price | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 12/09/98 | Treacy | 75,000 | $26.875 | $12.59 | 160,000 |
| 12/09/98 | Taylor | 100,000 | $26.875 | $12.59 | 213,333 |
| 12/09/98 | Collison | 5,000 | $26.875 | $12.59 | 10,667 |
| 12/09/98 | Camara | 100,00 | $26.875 | $12.59 | 213,333 |
| 12/09/98 | S. McKelvey | 2,500 | $26.875 | $12.59 | 5,333 |
| 12/09/98 | O'Connell | 6,500 | $26.875 | $12.59 | 13,867 |
| 12/09/98 | Olesnyckyj | 1,000 | $26.875 | $12.59 | 2,133 |
| 12/09/98 | Eisele | 2,001 | $26.875 | $12.59 | 4,269 |
| 12/09/98 | Add'l Recipients | 507,999 | $26.875 | $12.59 | 1,083,731 |
| **Total** | | **800,000** | | | **1,706,667** |

113.    During fiscal year 1998, Defendants backdated option grant dates for several Option Defendants.  Specifically, Director Defendant Eisele and Option Defendant S. McKelvey (Director Defendant McKelvey's son) were purportedly awarded option grants as of December 9, 1998, at $26.875 per share – *the lowest closing price for Monster common stock for the month*. Indeed, during the twenty days preceding the purported grant, Monster's stock price declined by 2.27% and during the twenty days following the purported grant, it increased by 52.56%.

114.    A graph demonstrating the purported timing of the 1998 grant is as follows:

36



115.    Like the 1997 grants, the 1998 options were purportedly granted at a time when the governing option plans did not permit the number of options granted by the Defendants.  In other words, the 1998 grants exceeded the limit of aggregate options permitted to be granted under the governing option plans.  Significantly, the 1998 grant was made "subject to stockholder approval of the 1999 Plan," which increased the total number of shares available to be issued for option grants from 3 million to more than 15 million, according to the Company's Proxy Statement filed on April 26, 1999 with the SEC.  The same Proxy stated that, "[o]n December 9, 1998, the Compensation Committee of the Board of Directors unanimously adopted, subject to stockholder approval at the 1999 Annual Meeting of Stockholders, the Company's 1999 Long Term Incentive Plan (the '1999 Plan')."  Given the suspicious timing of the December 9, 1998 grant – on the day of the lowest

closing price of the month – it is highly unlikely that the Compensation Committee, Director Defendants Gadding and Kaufman, in fact approved the grants and the adoption of the 1999 Plan on that date.

**1999 Option Grants**

116.    In 1999, the Company issued approximately 3,317,365 split-adjusted Monster stock options to Defendants Treacy, Taylor, Collison, Camara, Farrey, Pogorzelski, as well as other grantees, purportedly as follows:

| Date of Grant | Recipient | No. of Options Granted | Exercise Price | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 07/30/99 | Taylor | 1,000,000 | $46.938 | $22.00 | 2,133,333 |
| **Total** | | **1,000,000** | | | **2,133,333** |
| 08/05/99 | Treacy | 200,000 | $44.125 | $20.68 | 426,667 |
| 08/05/99 | Camara | 250,000 | $44.125 | $20.68 | 533,333 |
| 08/05/99 | Farrey | 7,500 | $44.125 | $20.68 | 16,000 |
| **Total** | | **457,500** | | | **976,000** |
| 10/18/99 | Collison | 25,000 | $50.000 | $23.44 | 53,333 |
| 10/18/99 | O'Connell | 10,000 | $50.000 | $23.44 | 21,333 |
| 10/18/99 | Farrey | 10,000 | $50.000 | $23.44 | 21,333 |
| 10/18/99 | Pogorzelski | 25,015 | $50.000 | $23.44 | 53,365 |
| **Total** | | **70,015** | | | **149,365** |
| 12/01/99 | Taylor | 150 | $95.000 | $44.51 | 320 |
| 12/01/99 | Collison | 5,000 | $95.000 | $44.51 | 10,667 |
| 12/01/99 | Olesnyckyj | 12,500 | $95.000 | $44.51 | 26,667 |
| 12/01/99 | Eisele | 2,500 | $95.000 | $44.51 | 5,333 |

| 12/01/99 | McLaughlin | 6,2500 | $95.000 | $44.51 | 13,333 |
|---|---|---|---|---|---|
| 12/01/99 | Add'l Recipients | 1,100 | $95.000 | $44.51 | 2,347 |
| **Total** | | **27,500** | | | **58,667** |
| **Grand Total** | | **1,555,015** | | | **3,317,365** |

117.    In 1999, the Company awarded Option Defendant Taylor a grant of approximately 1,000,000 options at $46.9375, purportedly on July 30, 1999 – ***the lowest closing price for Monster common stock for the month.*** Indeed, during the twenty days preceding the purported grant, Monster's stock price declined by 25.35% and during the twenty days following the purported grant, it increased by 18.91 %.

118.    Additional option grants were awarded to several Option Defendants purportedly dated on August 5, 1999 at $44.125 – the lowest closing price for Monster common stock for the fiscal quarter. During the twenty days preceding this purported grant, Monster's stock price declined by 27.96% and during the twenty days following the purported grant, it increased by 24.22%.

119.    Option grants were also purportedly awarded on October 18, 1999 to Option Defendants Collison, O'Connell, Farrey and Pogorzelski with a strike price of $50.00 – ***the lowest closing price for the quarter***. During the twenty days preceding the purported grant, Monster's stock price declined by 23.37% and during the twenty days following the purported grant, it increased by 88.38%.

120.    Also in 1999, Defendants – including Taylor (150 options), Collision (5,000 options), Olesnyckyj (12,500 options), Eisele (2,500 options) and McLaughlin (6,250 options) –

39

were purportedly awarded stock options on December 1, 1999 with a strike price of $95.00 – *the lowest closing price for the month.* Additional grantees received at least 1,100 options with this same favorable purported grant date and strike price. As was the case with the foregoing grants, these grants of approximately 27,500 options were backdated. Significantly, on December 2, 1999, the day after the purported grant date, Monster announced a $100 million contract with America Online, Inc. ("AOL"), which provided Monster with the exclusive job-searching space on AOL's web site. Based on the news, Monster's stock price rose from $109 to $127.06 on December 2, 1997 alone. Thus, Defendants made an immediate profit of $32.06 per share. By December 28, 2006, Monster's stock had closed at $160.31 per share, reflecting an increase of 69%, and representing a profit for the recipients of the purported December 1, 1999 grant of $65.31 per share.

121. A graph demonstrating the purported timing of the 1999 grants is as follows:



## 2001 Option Grants

122.    In 2001, the Company issued approximately 2,661,333 split-adjusted Monster stock options to Defendants Treacy, McLaughlin, O'Connell, Swam, Kramer, Kaufman, Olesnyckyj, Farrey, Eisele, Baker, Pogorzelski, Dolphin, as well as other grantees, purportedly as follows:

| Date of Grant | Recipient | No. of Options Granted | Exercise Price | Adjusted Exercise Price | Adjusted Number of Options |
|---------------|-----------|------------------------|----------------|-------------------------|----------------------------|
| 04/04/01 | Treacy | 5,000 | $30.625 | $28.69 | 5,333 |
| 04/04/01 | McLaughlin | 5,000 | $30.625 | $28.69 | 5,333 |
| 04/04/01 | O'Connell | 12,500 | $30.625 | $28.69 | 13,333 |

41

| 04/04/01 | Swann | 10,000 | $30.625 | $28.69 | 10,667 |
|---|---|---|---|---|---|
| 04/04/01 | Kramer | 10,000 | $30.625 | $28.69 | 10,667 |
| 04/04/01 | Kaufman | 10,000 | $30.625 | $28.69 | 10,667 |
| 04/04/01 | Olesnyckyj | 10,000 | $30.625 | $28.69 | 10,667 |
| 04/04/01 | Farrey | 10,000 | $30.625 | $28.69 | 10,667 |
| 04/04/01 | Eisele | 5,000 | $30.625 | $28.69 | 5,333 |
| 04/04/01 | Add'l Recipients | 2,122,500 | $30.625 | $28.69 | 2,264,000 |
| **Total** | | **2,200,000** | | | **2,346,667** |
| 10/02/01 | Baker | 9,500 | $25.520 | $23.93 | 10,133 |
| **Total** | | **9,500** | | | **10,133** |
| 11/01/01 | Treacy | 100,000 | $27.500 | $25.77 | 106,667 |
| 11/01/01 | Pogorzelski | 50,000 | $27.500 | $25.77 | 53,333 |
| 11/01/01 | McLaughlin | 50,000 | $27.500 | $25.77 | 53,333 |
| 11/01/01 | Dolphin | 25,000 | $27.500 | $25.77 | 26,667 |
| 11/01/01 | Olesnyckyj | 10,000 | $27.500 | $25.77 | 10,667 |
| 11/01/01 | O'Connell | 5,000 | $27.500 | $25.77 | 5,333 |
| 11/01/01 | Add'l Recipients | 55,000 | $27.500 | $25.77 | 58,666 |
| **Total** | | **295,000** | | | **314,667** |
| **Grand Total** | | **2,495,000** | | | **2,661,333** |

123.    During 2001, Defendants backdated option grants for several Defendants, including Director Defendants Eisele, Kaufman, Kramer and Swann.  The backdated options to these four Director Defendants and others were purportedly granted on April 4, 2001, at $30.625

42

per share – *the lowest closing price for Monster common stock for the second quarter of 2001*. In addition, during the twenty days preceding the purported grant, Monster's stock price declined by 39.66% and during the twenty days following the purported grant, it increased by 67.41%.

124.     According to a statement by Director Defendant McKelvey to The Wall Street Journal in June of 2006, this April 4, 2001 grant was "broad, covering some 2.2 million options to many employees." However, Defendants only disclosed in the Company's Proxy Statement filed with the SEC on April 26, 2002 the granting of 260,500 on April 4, 2001. The Proxy Statement thus concealed from the Plan and its participants the grant of nearly 2 million options.

125.     Approximately 9,500 option grants were awarded to Option Defendant Baker purportedly on October 2, 2001, at $25.52 – *the lowest closing price for Monster common stock for the quarter*.

126.     Several Option Defendants also were purportedly granted stock options on November 1, 2001 – including Treacy (100,000 options), McLaughlin (50,000 options) and Pogorzelski (at least 50,000 options) – at $25.77 – *pennies from the low price for Monster common stock for the quarter.* During the twenty days preceding the November 1, 2001 purported grant date, Monster's stock price declined by 13.52% and during the twenty days following the purported grant date, it increased by 50.15%.

127.     A graph demonstrating the purported timing of the 2001 grants is as follows: