## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JENNIFER TAYLOR, JULIE M. TOTSCH, THOMAS J. FOLEY, ANN BURKS, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREW J. McKELVEY, MONSTER WORLDWIDE, INC., MONSTER WORLDWIDE, INC. 401(K) SAVINGS PLAN ADMINISTRATIVE COMMITTEE, CHRIS G. POWER, GREG LIMOGES, PEGGY BUCHENROTH, ROBERT MOLNAR, MARGARETTA NOONAN, and JOHN and JANE DOES 1-10,<br><br>Defendants. | Civil Action No.: 06-cv-8322 (AKH) |

## JOINT DECLARATION OF THOMAS J. McKENNA AND STEPHEN J. FEARON, JR. IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, SETTLEMENT CLASS CERTIFICATION AND PLAN OF ALLOCATION AND MOTION FOR AWARD OF ATTORNEYS' FEES, EXPENSES AND CASE CONTRIBUTION AWARD

**SQUITIERI & FEARON, LLP**
Stephen J. Fearon, Jr.
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212)421-6492
Fax: (212)421-6553

**GAINEY & McKENNA**
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, New York 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

*Class Counsel for Plaintiffs*

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................1

II.  PROCEDURAL AND LITIGATION HISTORY .................................................2

    A.   Summary Of Action.......................................................................................2

    B.   The Motions To Dismiss...............................................................................3

    C.   Additional Discovery ....................................................................................6

    D.   Class Certification.........................................................................................7

    E.   Settlement Negotiations.................................................................................7

    F.   Terms Of The Settlement...............................................................................9

        1.   Settlement Class.....................................................................................9

        2.   Settlement Amount ................................................................................9

            (a)   Released Claims ........................................................................10

            (b)   Plan of Allocation......................................................................10

III. THE FORMS AND METHODS OF NOTICE EMPLOYED
HERE SATISFY RULE 23 AND DUE PROCESS .............................................11

IV.  THE SETTLEMENT WARRANTS THE COURT'S APPROVAL ...................13

    A.   The Complexity, Expense, And Likely Duration Of The Litigation ........................13

    B.   The Class's Reaction To The Settlement ...............................................................14

    C.   The Stage Of The Proceedings And Discovery Completed.....................................14

    D.   The Risk Of Establishing Liability ........................................................................15

    E.   The Risk Of Establishing Damages........................................................................16

    F.   The Risk Of Maintaining The Class Action Through Trial.....................................17

    G.   The Ability Of Defendants To Withstand A Greater Judgment ..............................18

H. The Reasonableness Of The Settlement In Light Of
The Best Possible Recovery And The Attendant Risks Of Litigation......................18

V. CLASS CERTIFICATION ..................................................................................20

 A. Class Certification Is Warranted Here .......................................................20

 B. Class Counsel Easily Meet The Requirement Of Rule 23(g)....................20

VI. THE PROPOSED PLAN OF ALLOCATION
SHOULD BE APPROVED ................................................................................21

VII. TIME AND EFFORT DEDICATED TO THIS CASE ........................................22

VIII. THE RECORD FULLY SUPPORTS THE AWARD
OF REQUESTED ATTORNEYS' FEES............................................................24

 A. The Time And Labor Expended By Counsel...............................................24

 B. The Magnitude And Complexities Of The Litigation..................................25

 C. Risk Of The Litigation ................................................................................26

 D. The Quality Of Representation ...................................................................27

  1. Class Counsel.....................................................................................27

 E. The Requested Fee In Relation To The Settlement.....................................28

 F. Public Policy...............................................................................................28

IX. CLASS COUNSEL SHOULD BE REIMBURSED
FOR REASONABLE EXPENSES ADVANCED IN THE LITIGATION .........29

X. NAMED PLAINTIFFS SHOULD BE GRANTED A CASE
CONTRIBUTION AWARD ..............................................................................29

XI. CONCLUSION...................................................................................................30

Thomas J. McKenna and Stephen J. Fearon, Jr. declare as follows under to the penalty of perjury pursuant to 28 U.S.C. § 1746:

## I.  INTRODUCTION

1.      I, Thomas J. McKenna, am a partner of Gainey & McKenna ("G&M"). I have been personally involved in the litigation of this matter and am responsible for the prosecution of this action.

2.      I, Stephen J. Fearon, Jr., am a partner of Squitieri & Fearon, LLP ("S&F"). I have been personally involved in the litigation of this matter and am responsible for the prosecution of this action.

3.      We submit this declaration in support of the Plaintiffs': (a) Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (b) Motion for Award of Attorneys' Fees, Expenses, and Case Contribution Awards (together, the "Motions"). The Parties' [Proposed] Order and Final Judgment is also submitted with this Joint Declaration.

4.      We are pleased to present for final approval the proposed settlement set forth in the Class Action Settlement Agreement ("Settlement Agreement") (Dkt. No. 180) pursuant to which a Settlement Fund of $4,250,000 has been established.[1] The Settlement Fund is invested in interest-bearing instruments. The Settlement represents an excellent result which will provide significant benefits to the Settlement Class, while removing the risk and delay associated with further litigation.

5.      Plaintiffs have provided notice to Class members as directed by the Court in its Order Preliminarily Certifying a Class for Settlement Purposes, Preliminarily Approving Proposed Class Action Settlement, Approving Form and Manner of Class Notice, and Setting

---

[1]      All capitalized terms not otherwise defined in this Joint Declaration have the same meaning given them in the Settlement Agreement.

Date for Hearing on Final Approval of Settlement and Award of Attorneys' Fees and Expenses and Plaintiffs' Case Contribution Awards ("Order for Notice and Hearing") (Dkt. No. 185). No objection has been received and the time has expired for Class members to object.

6. The Settlement is the result of hard-fought litigation in the context of a highly complex and risky case and contentious settlement negotiations under the supervision of an experienced mediator, the Honorable Nicholas Politan (Ret.). We are pleased to present the Settlement to the Court for its consideration and we request that the Court approve it and grant the related relief that Plaintiffs seek in the Motions.

## II. PROCEDURAL AND LITIGATION HISTORY

### A. <u>Summary Of Action</u>

7. In this action, Plaintiffs alleged that the Monster 401(k) Savings Plan's (the "Plan") fiduciaries violated their fiduciary duties under ERISA by: (1) failing to prudently and loyally manage the Plan and the Plan's assets; (2) failing to provide participants with complete and accurate information regarding Monster Worldwide, Inc. ("Monster" or the "Company") common stock ("Monster Stock" or "Company Stock") sufficient to advise participants of the true risks of investing their retirement savings in Monster Stock; (3) failing to properly monitor the performance of their fiduciary appointees, and remove and replace those whose performance was inadequate; (4) breaching their duty to avoid conflicts of interest; and (5) knowingly participating in a breach of fiduciary duty. Plaintiffs alleged that Defendants knew or should have known that the Plan's investment in Monster Stock was not a prudent retirement investment during the Class Period and that Defendants acted imprudently by not preventing further investment in Monster Stock and not liquidating those holdings.

8. In short, Plaintiffs alleged that Monster Stock was an imprudent investment

because during the Class Period, while Plan participants invested retirement assets in Company Stock, Defendants were mired in a pervasive options backdating scheme.

9.        Plaintiffs alleged that this backdating scheme, which began as early as 1997, artificially inflated Monster's financial results by more than $300 million, misrepresented the way that Monster granted options, and artificially inflated the price of the Company Stock.

10.        When the market discovered the scheme in June 2006, Monster restated more than $300 million of unreported compensation expenses and Monster's Stock price dropped, which Plaintiffs allege caused the Plan and its participants to suffer significant losses as a result of investing in Monster Stock.

**B.        The Motions To Dismiss**

11.        On October 12, 2006, Plaintiffs filed their initial complaint (Dkt. No. 1), followed by the First Amended Complaint on February 16, 2007 (Dkt. No. 6).

12.        Defendants vigorously contested this litigation from the outset. On June 8, 2007, Defendants moved to dismiss Plaintiffs' First Amended Complaint.

13.        Defendants attacked Plaintiffs' standing to assert the ERISA claims and also made the merits-based arguments that Plaintiffs could not establish any damages to the Plan because an investment in Monster Stock outperformed any market index or other investment alternative during the period from January 1997 (when the options backdating allegedly first began) until June 12, 2006 (when *The Wall Street Journal* published an article raising the possibility of backdating at Monster). In addition to other arguments, Defendants also asserted that the ERISA claims were barred by the safe harbor provisions of ERISA section 404(c), which Defendants claimed exempt a fiduciary from liability if the participant was able to direct his or her individual investments in the Plan.

14.     After extensive briefing, the Court heard oral argument and on December 14, 2007 the Court dismissed Plaintiffs' First Amended Complaint with leave to re-plead (Dkt. No. 102), but dismissed claims against certain Defendants with prejudice.

15.     Plaintiffs then filed their Second Amended Class Action Complaint (the "SAC") (Docket Entry No. 111) on February 15, 2008 which Defendants moved to dismiss on April 11, 2008 (Dkt. No. 123). Once again, Defendants urged that the Court should dismiss Plaintiffs' claims and they argued that the Plan suffered no damages, laying the ground work for a theme that Defendants would later repeat throughout the litigation. Defendants also asserted other arguments requesting dismissal but, following briefing by the parties and oral argument, the Court denied Defendants' motion to dismiss on July 9, 2008 (Dkt. No. 154).

16.     Plaintiffs and their counsel then began the process of preparing for the class certification stage of the case. Plaintiffs gathered relevant discovery and prepared for their testimony on class certification issues. As part of this process, Plaintiffs obtained numerous documents that were critical to the operation and administration of the Plan, including the Plan documents, trust agreements, summary plan descriptions and material modification, annual reports for the Plan, summary annual reports and a Plan prospectus as well as many other types of documents. Plaintiffs filed a motion to certify the case as a class action and began discovery, but when disputes arose about the scope of the discovery, the Court directed Plaintiffs to withdraw their motion for class certification and re-file it after the parties completed discovery on class certification issues.

17.     During this time, Class Counsel conducted substantial discovery to prepare for depositions and trial. Early in the case, Plaintiffs obtained more than two million pages of electronically-stored documents and began the labor-intensive process of reviewing these

materials. Plaintiffs engaged a document management firm to manage some of the electronic discovery and to assist Class Counsel with the large volume of discovery. By hiring this firm, Class Counsel were able to significantly reduce the number of hours the attorneys and other professionals devoted to document review. Instead of having numerous associates review millions of pages of documents, Plaintiffs were able to save significant attorney hours by electronically storing the documents and loading them into a searchable database.

18. In late 2007 and early 2008, Plaintiffs continued their discovery efforts and learned, unfortunately, that defendant McKelvey had recently been diagnosed with a terminal illness. Plaintiffs immediately sought to depose him but when Defendants refused, Plaintiffs moved to depose Defendant McKelvey, who was a critical witness. The Court granted Plaintiffs' motion (Dkt. No. 120) over Defendants' objection and Plaintiffs were immediately able to schedule Defendant McKelvey's video-taped deposition at which he repeatedly refused to answer questions and invoked his Fifth Amendment right against self-incrimination due to then-ongoing criminal investigations against him and other Monster executives about the options-backdating practices at the Company. The deposition of McKelvey was especially important because he was the Chairman and Chief Executive Officer of Monster during the time when Plaintiffs allege the Company was backdating its options grants and because Plaintiffs alleged that it was Defendant McKelvey who orchestrated the options backdating practices. Plaintiffs efforts were also fortuitous because Mr. McKelvey died months after Plaintiffs deposed him.

19. In addition to the millions of pages of documents that Plaintiffs obtained from Defendants, Class Counsel obtained exhibits and trial materials used in the criminal trial of Monster's former Chief Operating Officer, James Treacy, concerning the options backdating practices at the Company.

20.     For example, Class Counsel were able to obtain all of the trial exhibits offered by the government and by the defense in the criminal trial of Mr. Treacy, including copies of important documents that Defendants in this case had withheld from Plaintiffs on privilege grounds or for other reasons.

21.     Class Counsel also obtained the testimony given by witnesses in the Treacy trial, including testimony from one of the Plan fiduciaries who Plaintiffs sued here -- Defendant Margaretta Noonan, which concerned her knowledge of backdating practices at Monster during the time period at issue in this lawsuit. Similarly, Class Counsel obtained discovery from the criminal proceedings against other former officers of Monster, such as the criminal proceedings against Myron Olesnyckyj who was Monster's General Counsel while Monster was backdating options.

## C.     **Additional Discovery**

22.     During the litigation, in addition to what is discussed above, Plaintiffs engaged in extensive discovery, including propounding and responding to discovery requests, reviewing vast amounts of documents, and preparing the Plaintiffs for depositions and defending the Plaintiffs at those depositions.

23.     For example, Plaintiffs Jennifer Taylor (who resides in Georgia), Julie M. Tosch (who resides in Wisconsin), and Anne Burks (who resides in Georgia) attended their depositions. Class Counsel spent several days preparing each Plaintiff for her deposition. These depositions took place over several weeks in New York.

24.     Further, on July 24, 2008, Class Counsel served on Defendants' Plaintiffs' First and Second Request for the Production of Documents to All Defendants. Moreover, on September 10, 2008, Class Counsel served on Defendants Plaintiffs' Notice of Deposition of

Monster pursuant to Federal Rule Civil Procedure 30(b)(6).

25.     Class Counsel also responded to Defendants' request for discovery from Plaintiffs.

## D.     Class Certification

26.     On October 1, 2008, Plaintiffs filed a motion to certify the case as a class action and pursued class certification discovery, but when disputes arose about the scope of the discovery, the Court directed Plaintiffs to withdraw their motion for class certification and re-file it after the parties completed discovery on class certification issues.

## E.     Settlement Negotiations

27.     During the course of the litigation, counsel for the parties periodically explored the possibility of settling the case but remained far apart in their views about the value of the claims. Defendants consistently argued that the Plan had no damages as a result of the backdating scheme particularly because there was a very limited stock price decline when the market first learned about the options backdating and because Monster Stock out-performed the market index and the other alternate investments that were available to Plan participants. As a result, although counsel for the Parties had numerous conversations in which they attempted to negotiate a settlement, they remained far apart and were unable to settle.

28.     After Defendants had deposed three of the four Named Plaintiffs in connection with Plaintiffs' motion for class certification and while they were working on the schedule for the fourth Named Plaintiff deposition, the Parties mutually agreed to mediate the case with a well-respected former federal judge, Nicholas Politan.

29.     After initial conferences with Judge Politan, each side had the opportunity to

submit a detailed presentation of its best evidence supporting its position. This was then followed by a full-day mediation session in New York on July 23, 2009.

30.        The initial mediation did not result in an agreement to settle but each side better understood the claims and defenses as a result of the mediation and the Parties were able to narrow the gap that stood in the way of settling.

31.        The Parties left the mediation without an agreement and while they continued to litigate the case, Judge Politan continued his efforts to guide the parties to a settlement. Throughout this process, counsel for Defendants consistently argued that Plaintiffs would be unable to prove any amount of damages and contended that Monster Stock dropped only $1 to $2 per share in response to the disclosure of the options backdating and there were only 500,000 to 600,000 shares in the Plan. Defendants also contended that alternative investments did not significantly outperform Monster Stock as an investment.

32.        During July and August, 2009, the Parties continued their negotiations through Judge Politan and had numerous telephone calls to discuss the substance of each side's positions and contentions. With Judge Politan's guidance, the Parties were able to continue their negotiations and make progress in their discussions.

33.        On September 14, 2009, after weeks of additional negotiations through Judge Politan, the parties entered a Memorandum of Understanding ("MOU") outlining the terms of the proposed settlement. However, their negotiations continued for another two months as the parties negotiated the Class Action Settlement Agreement and related documents which the parties ultimately filed with the Court on November 13, 2009 (Dkt. No. 185).

34.        The resulting Settlement is a global one which, if approved by the Court, would release all claims against all Defendants and bring this litigation to a close.

35.     The Parties have agreed to settle all claims arising out of the ERISA action for $4,250,000 on behalf of a Class of participants and beneficiaries in the Plan. This money, net of Court-approved attorneys' fees and expenses, notice and other expenses described in ¶¶ 9.1, 9.2 of the Settlement Agreement, will be directed to the accounts of Class members pursuant to the Court-approved Plan of Allocation. The Settlement allows counsel for Named Plaintiffs to request attorneys' fees in an amount to be fixed by the Court plus interest and reimbursement of expenses, as well as to request Case Contribution Award of $10,000 for Named Plaintiffs Jennifer Taylor, Julie M. Tosch and Anne Burks, and $5,000 for Named Plaintiff Thomas J. Foley.

## F.     Terms of the Settlement

36.     The principal terms of the Settlement, which are described in the Settlement Agreement previously filed with, and preliminarily approved by, the Court, are summarized as follows:

### 1.     Settlement Class

37.     The Settlement Agreement contemplates that the Court will certify the following settlement class under Fed. R. Civ. P. 23(b)(1) and (b)(2):

> All persons who were participants in or beneficiaries of the Plan during the Class Period whose accounts included investments in Monster common stock or units in the Monster Stock Fund. This includes any persons who have been participants or beneficiaries of the Plan since January 1, 2000 but who as of September 14, 2009, were no longer participants or beneficiaries of the Plan. Excluded from the Settlement Class are Defendants and the Dismissed Defendants.

Order for Notice and Hearing ¶ 2.

### 2.     Settlement Amount

38.     Plaintiffs and Defendants have proposed to settle all claims against

Defendants for the sum of $4.25 million, which amount has been deposited into an interest-bearing escrow account. This amount is the "Settlement Fund," and, less approved attorneys' fees, expenses and Case Contribution Awards to Plaintiffs' Counsel and Named Plaintiffs, shall be for the benefit of the Plan's participants and beneficiaries. Settlement Agreement ¶¶ 1.44, 8.1.

39.     If the Settlement is finally approved and such approval becomes non-appealable, the Net Settlement Fund proceeds will be distributed to the Plan for allocation to the accounts of Class members. *Id.*, ¶ 1.18.

### (a)     **Released Claims**

40.     If the Court approves the Settlement, Plaintiffs would release their and the Class's ERISA claims against Defendants and certain associated entities arising during the Class Period. *Id.*, ¶¶ 1.37, 1.38, 3.1, 3.2.

### (b)     **Plan of Allocation**

41.     The Net Settlement Fund will be allocated to the Plan accounts of Class members pursuant to a detailed Plan of Allocation that is being submitted to the Court for approval. When Plaintiffs filed their motion for preliminary approval they also filed an initial proposed Plan of Allocation. In general terms, the Net Settlement Fund will be allocated to Class members on a *pro rata* basis such that the amount received by each Class member will depend on his or her calculated loss, relative to the losses of other Settlement Class members, resulting from the Plan's investments in Monster Stock. In this way, the Plan of Allocation will distribute the Net Settlement Fund equitably based upon each Class member's estimated loss. Plaintiffs now seek Court approval of the Plan of Allocation.

42.     In between the time of the issuance of Class Notice and the scheduled date

for the Fairness Hearing, the Settlement Administrator ("A.B. Data") notified Class Counsel that certain information regarding the Plan participants' accounts and transactional history was missing. In particular, A.B. Data reported that Defendants -- through the Plan's administrator Charles Schwab –were able to produce daily transactional data for the Plan between April 1, 2001 and September 14, 2009, but were only able to produce quarterly transactional data for the period from January 1, 2000 and March 31, 2001.

43.     The Parties have consulted with each other and agreed to include a provision in the Plan of Allocation to address this. *See* revised Plan of Allocation, at 4 (Part III(G)(1-6)), attached hereto as Exhibit A. Specifically, the Plan of Allocation has been revised to provide for the use of provisional transactions based on the available quarterly transactional data for the period from January 1, 2000 through March 31, 2001 for purposes of the calculating Net Loss. *Id.* Class Counsel have consulted with the Settlement Administrator about this proposed revision and with Defendants' counsel and, after receiving guidance from the Settlement Administrator, now recommend the proposed Plan of Allocation as fair, reasonable and not unduly complicated or expensive and urge the Court to adopt and approve it.

## III.    THE FORMS AND METHODS OF NOTICE EMPLOYED HERE SATISFY RULE 23 AND DUE PROCESS

44.     In accordance with the Order for Notice and Hearing, the Settlement Class has been provided with ample and sufficient notice of this Settlement, including an appropriate opportunity to voice objections. The notice plan fully informed Settlement Class members of the lawsuit and the proposed Settlement as well as the related relief sought by Plaintiffs in this Motion, and enabled Class members to make informed decisions about their rights.

45.     The Parties' notice plan, as approved by the Court and implemented by Class Counsel, consisted of: (a) mailing the Class Notice on December 24, 2009 to more than

7,808 Class members at their last known addresses provided by Defendants (b) publishing the Publication Notice in the national edition of *Investors Business Daily* (*see* Affidavit of Michelle M. La Count regarding dissemination and publication of the Notice ("La Count Aff.") ¶ 9), attached hereto as Exhibit B and Exhibits 1, 2 and 3 thereto; and (c) creating a dedicated website overseen by Class Counsel which provides information to Settlement Class members, together with a toll-free telephone number that Class members may call (and in fact, have called) to obtain information regarding the Settlement.

46.     The Class Notice provided detailed information about the Settlement, including: (a) a comprehensive summary of its terms; (b) notice of Class Counsel's intent to request attorneys' fees, reimbursement of expenses, and Case Contribution Awards for the Named Plaintiffs; and (c) detailed information about the Released Claims. In addition, the Class Notice provided information about the Fairness Hearing date, Settlement Class members' rights to object (and deadlines and procedures for objecting), and the procedure to receive additional information. The Class Notice provided Class members with contact information for Class Counsel, e-mail addresses for inquiries, information on the toll-free phone number, and a website address for further information. The Publication Notice summarized the above information for purposes of publication. In addition, this Court's Preliminary Approval Order (Dkt. No. 185) also required Monster to post a link on its website's Investor Relations webpage to the dedicated settlement website which was also done.

47.     The notice forms and methods used here are substantially similar to those successfully used and approved by courts in many other ERISA class settlements and satisfy the requirements of due process and Rule 23.

## IV. THE SETTLEMENT WARRANTS THE COURT'S APPROVAL

48.     We briefly review the record in support of each of the following nine factors used by the Second Circuit in *Grinnell*[2] in considering the fairness, reasonableness and adequacy of a proposed settlement: (a) the complexity, expense and likely duration of the litigation; (b) the reaction of the class to the settlement; (c) the stage of the proceedings and the amount of discovery completed; (d) the risks of establishing liability; (e) the risks of establishing damages; (f) the risks of maintaining the class action through the trial; (g) the ability of the Defendants to withstand a greater judgment; (h) the range of reasonableness of the settlement fund in light of the best possible recovery; and (i) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

### A.     The Complexity, Expense, And Likely Duration Of The Litigation

49.     This case presented complex factual and legal issues against the backdrop of a fast-developing and hotly disputed area of the law.

50.     Plaintiffs' claims raise numerous complex legal and factual issues which required Plaintiffs to consult with experts and would have required expert discovery and testimony had the case not settled. This was true of the ERISA issues and the facts and circumstances surrounding the business practices that underlay the breach of duty claims in the SAC.

51.     Given that the law is developing, there are significant conflicts between the approaches adopted by different trial and appellate courts. Class Counsel believes the claims in this case are solidly grounded in ERISA law, but it is beyond debate that the issues are complex.

52.     ERISA jurisprudence presents an ever changing legal landscape, and there is

---

[2]     *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

a constant risk that the law will change before judgment. While many recent decisions have upheld claims similar to those asserted here, there was no assurance a change in the law would not have affected, or negated, the claims in this lawsuit.

53. This Settlement cuts short additional expert discovery, and eliminates the time and expense of the substantial briefing that likely would occur going forward in this case. Thus, this Settlement conserves judicial resources and eliminates the expense associated with proceeding with expert discovery and briefing required to defeat Defendants' anticipated Motion for Summary Judgment and prepare Plaintiffs' case against Defendants for trial.

54. Even if the Class could recover a judgment at trial, the additional delay through trial, post-trial motions, and the likely appellate process could deny the Class any actual recovery for years, further reducing its value. Together, these factors weigh in favor of final approval of the Settlement.

**B.      The Class's Reaction To The Settlement**

55. In response to the more than 7,808 Class Notices that were mailed, as well as the Publication Notices, Plaintiffs have received no objection to the Settlement or any of the related relief that Plaintiffs request in their Motions.

56. Between December 24, 2009 and February 1, 2010, Class Counsel have responded to inquiries from Class members by telephone, email and letter, and have received updated address and contact information from certain Class members, but have received no objection to the proposed Settlement or the related relief sought.

**C.      The Stage Of The Proceedings And Discovery Completed**

57. Plaintiffs have developed a comprehensive understanding of the key legal and factual issues in the case based on the extensive discovery conducted to date.

58.     The Parties have fully briefed and argued two separate sets of motions to dismiss, allowing both sides to understand the legal issues facing Plaintiffs and Defendants. They also have had the benefit of significant discovery, which has allowed them to better understand the strengths and weaknesses of both sides' positions.   In terms of discovery, Plaintiffs had reviewed more than two millions of pages of documents and also gathered substantial information from the parallel criminal proceedings against former Monster General Counsel Myron Olesnyckyj, the criminal proceedings against former CEO and ERISA fiduciary Andrew J. McKelvey, and the criminal trial of former Monster COO James Treacy.  The parties also engaged in full briefing for the mediation and have had the benefit of exchanging information in the mediation and discussing the case with an experienced mediator.  By all accounts, the parties have "a clear view of the strengths and weaknesses of their cases." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-11814, 2004 U.S. Dist. LEXIS 8608, at *10 (S.D.N.Y. May 14, 2004) (quotation omitted), and are well aware of the range of possible outcomes at trial.

**D.     The Risk Of Establishing Liability**

59.     In Plaintiffs' view, Defendants were Plan fiduciaries who, as a result of their inattention, negligence and/or affirmatively venal behavior, failed to protect the participants from preventable losses.  Nonetheless, this case is fraught with risk at every turn.

60.     First, ERISA company stock cases involving 401(k) plans are quite new. The first pioneering cases were not filed until the late 1990s and while a substantial body of case law has developed on decisions involving motions to dismiss and on class certification issues, the results of these cases are decidedly mixed.  Few cases have gone to trial.

61.     Second, Defendants have raised and (if the case continued to trial) can be

expected to raise a host of defenses, any one of which, if successful, might end or severely limit Plaintiffs' case. A brief review of some of Defendants' major legal contentions suffices to illuminate the serious litigation risks faced by Plaintiffs and the Settlement Class:

- Defendants argued that Plaintiffs' misrepresentations claims, even if proven, support liability only if Plaintiffs established individual reliance on the misrepresentations;

- Defendants consistently argued that Plaintiffs would be unable to prove any amount of damages and contended that Monster Stock dropped only $1 to $2 per share in response to the disclosure of the options backdating and that Monster Stock out-performed the alternative investments in the Plan during the time period when Monster was backdating stock options;

- Defendants contended that any false statements were contained only in the Company's SEC filings which, according to Defendants, are not fiduciary communications;

- Defendants contended that they were shielded from liability by ERISA section 404(c) which applies when participants have the ability to select how to invest their retirement savings;

- Defendants contended that many Class members themselves received backdated stock options in connection with their employment and knew about the Company's options practices and hence should be estopped from complaining about it in this case; and

- Defendants contended that even if some Defendants knew about the backdating, other Defendants did not know about it until *The Wall Street Journal* article caused Monster to begin an internal investigation which revealed the backdating.

62.     In addition to the specific issues discussed above, Plaintiffs would, of course, face the host of risks presented in any complex litigation of this type if the case were to go to trial.

## E.     The Risk Of Establishing Damages

63.     As discussed in Section IV(C)(5) of the Final Approval Memorandum,

ERISA requires breaching fiduciaries to make good to the plan the difference between prudent plan alternatives and the challenged imprudent investment. No ERISA company stock class action has been tried to a successful conclusion for plaintiffs, however, and, accordingly, no court has definitively applied a damage measure to a case such as this at trial. This void, coupled with the Defendants' vigorous defense of the damage aspects of the case, created risk for Plaintiffs.

64.     Further, damage calculations in ERISA cases like these are computer and expert intensive. The proof requires a computer model of the Plan, tracking the Plan's holdings of Company Stock, often on a daily basis, and the returns those holdings generate. This data is then compared with the performance of alternative investments on specified breach dates, subject to various additional factors and assumptions, such as the size of the Plan's holdings compared to the market as a whole. The expert must create the model, test it, use it, and effectively explain it. In addition, in making these calculations, complex determinations need to be made about the precise period during which the investment in employer stock was imprudent, and the proper investment alternative to use as a comparison. Any assumptions the expert makes in creating his model will be open to attack on cross-examination.

65.     Another argument that could significantly reduce damages is the contention that "holder" damages are unavailable. Part of the damages sought in this case is for claims that the Plan should not have continued to hold Monster Stock. ERISA defendants often dispute the availability of relief for "holder" losses because, in their view, the securities laws would have prevented them from divesting the plan of the stock without first publicly disclosing the adverse information making the stock imprudent, and had such disclosure been made, the defendants argue the stock price would have dropped, and the plan would have suffered the same loss that

17

occurred when the allegedly improper practices came to light. In fact, Defendants made this argument here. Plaintiffs strongly disagree with this analysis as it presumes that ERISA (and the securities laws) countenance the Plan's fiduciaries taking no action to protect the Plan where the shares remain inappropriately risky even after disclosure. Nonetheless, Plaintiffs recognize that the defense bar sharply attacks holder damages and that the law is unsettled in this area.

66.     Additionally, Plaintiffs face arguments that damages should be measured using an alternative to the *Bierwirth* best plan alternative measure – one based on the "price inflation" of Monster Stock during the Class Period, which could also reduce significantly or eliminate damages.

**F.     The Risk Of Maintaining The Class Action Through Trial**

67.     Class Counsel believe this case is appropriate for Class certification as this is a representative action brought by Plaintiffs on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Nevertheless, when the parties agreed to the proposed settlement, the Court had not yet ruled on Plaintiffs' motion for Class certification and, as in every proposed class action, there was always a risk to Plaintiffs that the Court could deny Class certification for a host of reasons.

**G.     The Ability Of Defendants To Withstand A Greater Judgment**

68.     In addition to this lawsuit, Monster was named as a defendant in a securities class action that arose out of the same improper practices at issue in this case. However, because Monster had settled that lawsuit, this factor was not a primary focus of the settlement negotiations.

**H.     The Reasonableness Of The Settlement In Light Of The Best Possible Recovery And The Attendant Risks Of Litigation**

69.     The Settlement came in time to avoid the risks posed by the motions for

summary judgment that Defendants would make and their opposition to class certification.

70.     In this case and many other similar cases, the "breach" date – that is the date at which Defendants knew or should have known that Monster Stock was an imprudent investment for participants' retirement assets – would have a significant impact on the total amount of Plaintiffs' potential recovery in the ERISA Action.  Plaintiffs allege that Monster Stock was an imprudent investment for the Plan from the beginning of the Class Period, and, thus, assert that losses to the Plan should be calculated from January 1, 2000 to the present.

71.     If Plaintiffs were to prevail and the Court were to accept Plaintiffs' damages model, which admittedly would involve a total victory on all issues by Plaintiffs, the principal loss could be in excess of the Settlement Amount.  If, alternatively, Plaintiffs were only able to establish a breach date later in the Class Period, the potential recovery would decrease significantly.

72.     As described above in section D, Plaintiffs anticipate that Defendants would advance several arguments to reduce or eliminate damages.  For example, Defendants would dispute that they knew or should have known that Monster Stock became an imprudent investment during the Class Period, or if it did become imprudent, it was late in the Class Period.

73.     Plaintiffs, of course, dispute Defendants' damage theories, and would resist any effort to decrease their recovery in this case, but, nonetheless, recognize that their ability to recover in this case is far from certain.

74.     Considering the time value of money, the probability of lengthy litigation in the absence of a settlement, the risk that the Class would not succeed in proving liability against Defendants, the range of possible recovery at trial, and the potential that significant amounts of the applicable fiduciary liability insurance, a wasting asset, would be spent on further litigation

and defense costs and would not be available to pay any judgment obtained at trial, the Settlement is well within the range of reasonableness.

## V.    CLASS CERTIFICATION

### A.    Class Certification Is Warranted Here

75.    As explained in Section V of the Final Approval Memorandum, certification of the following Class under Rule 23(b)(1) and (2) is warranted here:

> All persons who were participants in or beneficiaries of the Plan during the Class Period whose accounts included investments in Monster common stock or units in the Monster Stock Fund. This includes any persons who have been participants or beneficiaries of the Plan since January 1, 2000 but who as of September 14, 2009, were no longer participants or beneficiaries of the plan. Excluded from the Settlement Class are Defendants and the Dismissed Defendants.

Order for Notice and Hearing ¶ 2.

### B.    Class Counsel Easily Meet the Requirements of Rule 23(g)

76.    Class Counsel have made extensive efforts in successfully prosecuting this case and in achieving this Settlement, and believe we satisfy the dictates of Rule 23(g).

77.    Class Counsel have prepared several detailed and thorough complaints, extensively briefed the many complex and novel issues in this case, thoroughly investigated the claims, gathered relevant information, conducted extensive discovery, worked closely with experts, and engaged in hard-fought and ultimately successful negotiations with Defendants, including negotiations sponsored by retired Judge Politan.

78.    Class Counsel have years of experience prosecuting ERISA class actions and other complex actions. Class Counsel are experienced in ERISA litigation, and have litigated numerous cases involving allegations that investments in employer stock within defined contribution plans and 401(k) plans were imprudent and inadequately disclosed. *See, e.g.,* §

VIII(D), *infra*, and Exhibits C and D hereto. Class Counsel's experience and skill are demonstrated by the effective prosecution of this action, including the identification, investigation, and prosecution of the claims in this action, and by the substantial Settlement entered into with Defendants.

## VI.   THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED

79.     The proposed Plan of Allocation reflects Class Counsel's informed consideration of the relevant legal and factual matters pertaining to the Class members' claims. It provides recovery to Class members, net of administrative expenses and net of attorneys' fees and expenses and Case Contribution Awards that the Court may approve. We have prepared similar plans for numerous other cases.

80.     None of the settlement funds "revert" to Defendants as a result of implementing the Plan of Allocation.

81.     As stated in the Class Notice, the Net Settlement Fund will be allocated to Class members on a *pro rata* basis such that the amount received by each Class member will depend on his or her calculated loss, relative to the losses of other Class members, related to the Plan's investments in Monster Stock.   The allocation formula takes into account each participant's purchases and sales during the Class Period, and the balance, if any, at the end of the Class Period.   To the extent that Defendants are unable to provide daily transactional information for the first 15 months of the Class Period, the Plan of Allocation contains a mechanism for the Settlement Administrator to use a uniform method of calculating losses and allocating those losses among the Class members.   Specifically, the Plan of Allocation provides for the use of provisional transactions based on the available quarterly transactional data for the period from January 1, 2000 through March 31, 2001 for purposes of the calculating Net Loss.

*See revised* Plan of Allocation, at 4 (Part III(G)(1-6)), attached hereto as Exhibit A.

82.     Payments will be made by crediting the accounts of active Plan participants with the appropriate amount and by creating or re-creating an account for Class members who are no longer active participants, and then crediting their accounts in the same manner. This is substantially the same methodology used in many other ERISA cases involving issues about company stock. In all of those cases, the methodology was employed without objection from the Department of Labor and any independent fiduciary, and was approved by the court.

83.     We believe that the proposed Plan of Allocation is fair, reasonable and not unduly complicated or expensive and accordingly urge the Court to adopt and approve it.

## VII.   TIME AND EFFORT DEDICATED TO THIS CASE

84.     Class Counsel devoted more than 1,948 attorney and professional hours to prosecuting this case.

85.     Since Plaintiffs began this case, in accordance with their normal business practices, Class Counsel have maintained detailed and contemporaneous records of the time spent by their lawyers, law clerks, paralegals and certain other personnel on this action. Class Counsel's timekeepers have been and are required to keep daily time records, noting the time spent on projects and describing that work. These records then are computerized, checked, and maintained in databases. These systems allow us to be confident that the hours reported for this case are accurate.

86.     The schedules attached as Exhibits E and F are true and accurate summaries of the time spent by attorneys and other professional support staff in this litigation, and the lodestar calculation based on the firm's current billing rates from the inception of the case though January 29, 2010.

87.     The hourly rates charged by Class Counsel in this case are the rates that have been or could be charged as usual and customary hourly rates for their work performed for non-contingency fee clients and in other class action cases. Class Counsels' hourly rates have been paid by hourly clients and/or, separately, approved for payment by federal and state courts in other class and derivative litigations, for many years and throughout the time this litigation has been pending.

88.     The lodestar figures are based on each firm's current billing rates and contemporaneous time records. Expense items are billed separately and such charges are not duplicated in a firm's billing rates.

89.     Based on Class Counsel's collective current lodestar, the $1,399,349.40 fee sought by Plaintiffs represents a "multiplier" of 1.31.

90.     Significant additional attorney hours will be necessary after January 29, 2010, the date as of which the above numbers were compiled, to complete the remaining work on this case. In addition to incurring hours in connection with the final approval hearing, past experience teaches that we will spend a substantial amount of additional time over the next year or more following final approval responding to inquiries from Class members, interacting with bank personnel with respect to technical matters concerning the Qualified Settlement Fund, and generally shepherding the settlement which affects more than 7,000 participants. Class Counsel does not intend to apply for reimbursement of additional fees, substantial as they may be, incurred after Final Approval. However, for purposes of evaluating the reasonableness of the 32.92% fee request, and performing the lodestar cross-check, it is appropriate to consider the additional fees that Class Counsel will incur. Class Counsel conservatively estimate that, at a minimum, additional fees will be $60,000.00. Thus, whereas the current lodestar is

$1,068,083.71 the estimated final lodestar will be at least $1,128,083.71.

## VIII.  THE RECORD FULLY SUPPORTS
##       THE AWARD OF REQUESTED ATTORNEYS' FEES

91.     Class Counsel seek an award of attorneys' fees in the amount of $1,399,349.40, and reimbursement of out-of-pocket litigation expenses of $51,951.81.   In addition, Class Counsel request that the Court grant Case Contribution Awards of $10,000 each to Named Plaintiffs Jennifer Taylor, Julie M. Tosch and Ann Burks, each of whom was actively involved in pursuing the Action for the Settlement Class and was deposed, and $5,000 to Named Plaintiff Thomas J. Foley who pursued his case, cooperated with counsel and was ready to make himself available for a deposition before the case settled.  We are requesting a lower Case Contribution Award for Plaintiff Foley because he did not have to travel to New York for a deposition in this case.

92.     Class Counsel briefly review the record in support of each of the following six factors used when courts consider the reasonableness of proposed fee applications:

> (a)     the time and labor expended by counsel;
>
> (b)     the magnitude and complexities of the litigation;
>
> (c)     the risk of the litigation;
>
> (d)     the quality of representation;
>
> (e)     the requested fee in relation to the settlement; and
>
> (f)     public policy considerations.

## A.    The Time And Labor Expended By Counsel

93.     Class Counsel have dedicated substantial efforts to this case since it was filed. *See, e.g.,* ¶¶ II(A)-(D) above.  Having served in leadership positions in similar cases, we were aware at the outset of the case that our firms would be required to devote considerable time

and resources to prosecute this case. In all, Class Counsel devoted more than 1,948 hours to successfully prosecuting the action, and advanced $51,951.81 in expenses. *See* Sections VII and IX herein.

94.     Class Counsels' efforts were conducted efficiently and with cost-savings in mind. Where feasible, work was assigned to associates and paralegals with lower billing rates, to provide quality work at the lowest cost. However, senior attorneys often performed a significant portion of the work because they were able to complete the tasks more quickly than less-experienced associates, and because senior attorneys could make strategic and substantive decisions as they performed the work, allowing them to be more efficient than junior attorneys would be. We took significant precautions to avoid duplication of effort, prevent unauthorized work, and ensure that areas of potential discovery deemed tangential were not pursued. We were also able to conserve resources and reduce the lodestar in this case by carefully crafting and maintaining an electronic discovery database which allowed us to efficiently manage, code, research and filter millions of pages of discovery material. Although it would have been easy for Class Counsel to spend considerably more attorney time reviewing and analyzing the document discovery, Class Counsel instead chose to minimize the attorney time by carefully developing and utilizing this electronic database.

**B.     The Magnitude And Complexities Of The Litigation**

95.     As noted above, this case was large in scope, covered a lengthy time period and was in a fast-developing and hotly disputed area of the law.

96.     As discussed in Section IV above, Plaintiffs' claims raise a host of contested legal and factual issues, each of which would require extensive lay and esoteric expert discovery and testimony to resolve. This was true of both the ERISA issues and the complicated

underlying issues concerning Monster's alleged failure to disclose its option backdating practices.

97.     Despite the complexity and uncertainty in the law and the vigorous defense the Defendants mounted at every juncture, Class Counsel navigated this case to a successful conclusion.

## C.     Risk Of The Litigation

98.     As noted above, Class Counsel face substantial risks in ERISA fiduciary breach class actions, including this one.

99.     The case law on ERISA class action litigation is exceptionally thin compared to securities and antitrust jurisprudence, with only a few appellate decisions on most issues. There have been some substantial settlements, but nothing to rival the larger ones in the securities field (where the classes and the damages suffered are much larger). The lack of a mature body of law and practice in this field, and the resulting potential for significant changes as the law evolves, greatly increases the risk associated with litigating a complex case such as this one.

100.     Turning to the specific risks presented by this litigation, there were many. As described in Sections IV(D) through (F)(1) above, there were risks of establishing liability and damages, and risks of maintaining Class certification.

101.     Class Counsel accepted this case on a contingent basis, with the attendant risk that they would receive no fee or expense reimbursement if the case was lost. They therefore should be rewarded for overcoming the risks involved and bringing the case to a successful resolution.

**D.** **The Quality Of Representation**

102.     This demanding case presented difficult factual, procedural, and legal issues. It involved millions of pages of documents. Successfully marshalling the evidence and applying the law to it required a high degree of expertise in complex ERISA and class action matters. Class Counsel provided the high quality of services this case required, employing the expertise they have garnered from spearheading company stock class actions and other ERISA and class actions over the years.

**1.** **Class Counsel**

103.     Rule 23(g) requires the Court to examine the capabilities and resources of counsel for the Class to determine whether they have provided adequate representation to the Class. Here, Class Counsel for the Class satisfy Rule 23(g) because they have substantial experience handling class actions, other complex litigation and claims of the type asserted here. Of particular relevance here, Class Counsel has litigated numerous similar ERISA class action cases and has recovered millions of dollars for plan participants and retirees in these cases.

104.     Class Counsel's capabilities and resources are demonstrated by the work they performed in this case. Class Counsel has done substantial work to investigate potential claims by interviewing witnesses, reviewing publicly available information and obtaining extensive documents from Defendants, the government and other sources in discovery. Class Counsel also has vigorously pursued the interests of the Class through motion practice, discovery, mediation and extensive negotiations. Hence, Class Counsel's exhaustive efforts in prosecuting this case, in combination with Counsel's in-depth knowledge of the relevant law, satisfy Rule 23(g).

**E. The Requested Fee In Relation To The Settlement**

105.    The requested fee of $1,399,349.40[3], representing a multiplier of approximately 1.31 of the total lodestar of $1,068,083.71, is plainly reasonable under a lodestar/multiplier analysis.

106.    The requested fee is also reasonable under the percentage-of-the-fund analysis. The award represents approximately 33% of the total recovery, is well-warranted, and well within the range of awards made by district courts in the Second Circuit. *See In re Marsh ERISA Litig.*, No. 04-cv-8157, (S.D.N.Y. Jan. 29, 2010), Decision And Order Approving The Class Action Settlement; Certifying The Class For Settlement Purposes; Approving The Plan Of Allocation; Awarding Attorneys' Fees And Expenses; Granting Case Contribution Awards; And Rejecting The Objections Received, attached hereto as Exhibit I (approving award of attorneys' fees in an amount representing 33.33% of the total recovery).

107.    Courts in the Second Circuit and elsewhere, in ERISA and non-ERISA cases, have awarded a higher percentage of fees than that requested here.

**F. Public Policy**

108.    Public policy encourages skilled attorneys to bring ERISA suits such as this one. Congress passed ERISA as a means of promoting an important and essential public policy—protecting and preserving the retirement savings of American workers. In fact, the statute itself specifically encourages private enforcement of ERISA. *See, e.g.*, ERISA § 502(a), 29 U.S.C. § 1132(a) (specifically empowering participants and beneficiaries to bring civil actions to redress violations and/or enforce provisions of ERISA).

109.    There was no other ERISA action brought for participants in the Monster

---

[3]    Class Counsel have requested a one-third fee of the net settlement amount only after reimbursement of case-related expenses. Using this methodology reduces the requested fee.

Plan. Without the efforts of Class Counsel, the participants in the Plan would not have obtained any relief at all. The Department Of Labor seldom brings its own actions in cases like these, and it evinced no intent to make an exception in this case. Class Counsel clearly have promoted the public interest by vindicating the rights of the aggrieved Plan participants, and it is in the public interest for them to be paid a reasonable attorney's fee. No objection has been made by any class member to the requested fee.

## IX. CLASS COUNSEL SHOULD BE REIMBURSED FOR THE REASONABLE EXPENSES ADVANCED IN THE LITIGATION

110.    Class Counsel have advanced un-reimbursed expenses in order to conduct the litigation. The expenses incurred in this action are commercially reasonable and are reflected on the books and records of each firm. These books and records are prepared from expense vouchers, check records and other source materials and represent an accurate recordation of the expenses incurred. The expenses include necessary travel, expert witnesses and copying, as well as telephone, fax, and computer aided research and document database storage and maintenance. True and correct summaries of each firms' expenses are attached hereto as Exhibits G and H. No objection has been received to the proposed reimbursement of case-related expenses.

## X. NAMED PLAINTIFFS SHOULD BE GRANTED A CASE CONTRIBUTION AWARD

111.    Last, but by no means least, we wish to note the considerable efforts made by Named Plaintiffs Jennifer Taylor, Julie M. Tosch, Ann Burks and Thomas J. Foley. These Plaintiffs have been active, hands-on participants in this litigation, expending significant amounts of their own time to benefit the Class. They came forward to initiate this action and remained in contact with Class Counsel during the litigation. They provided documents and information; responded to document requests and interrogatories; three of them traveled to

meetings with Class Counsel and then sat for their depositions in New York. Each Plaintiff reviewed and approved pleadings and participated in the settlement process by consulting with Class Counsel on the adequacy of Defendants' settlement proposals. Each of these individuals devoted considerable time to help the Settlement Class achieve the proposed Settlement and we ask the Court to recognize their efforts by awarding Plaintiffs Taylor, Tosch and Burks a Case Contribution Award of $10,000 and Plaintiff Foley a Case Contribution Award of $5,000.

112.     The Class Notice disclosed that the Named Plaintiffs would seek these awards for Plaintiffs' initiative and efforts in the litigation. No objection to the proposed award has been received to date.

113.     We therefore respectfully suggest that payment of the requested Case Contribution Awards to Named Plaintiffs Jennifer Taylor, Julie M. Tosch, Ann Burks and Thomas J. Foley is well-deserved and wholly appropriate given the effort individuals devoted to this case.

## XI.    CONCLUSION

114.     For the reasons discussed herein, we recommend the Settlement as a fair, adequate, and reasonable resolution of the claims in this complex and hard-fought ERISA class action. We also suggest that the requested fee, expenses and Case Contribution Awards are well warranted. Thus, Class Counsel respectfully request that the Court grant their Motions in their entirety.

We declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Dated this 1st day of February, 2010, at New York, New York City.

_____
Thomas J. McKenna

_____
Stephen J. Fearon, Jr.